**DADDY'S JUNKY MUSIC STORES, Plaintiff,**

v.

**BIG DADDY'S FAMILY MUSIC CENTER, Defendant.**

No. C–2–95–334.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 31, 1996.

Gail L. Morissey, Dublin, Ohio, for Plaintiff.

Jon M. Peterson, Delaware, Ohio, for Defendant.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Plaintiff alleges trademark infringement in violation of 15 U.S.C. § 1114, false designation in violation of 15 U.S.C. § 1125(a), and unfair competition and deceptive trade practices under Ohio law. This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 10 & 12). For the reasons stated below, the Court **Denies** plaintiff's summary judgment motion and **Grants** defendant's summary judgment motion.

### I.

**A. Plaintiff Daddy's Junky Music Stores.**

Plaintiff Daddy's Junky Music Stores operates a chain of thirteen retail stores in the Northeast doing business as "Daddy's" and "Daddy's Junky Music Stores." These stores sell new and used musical instruments. Plaintiff also operates a substantial mail order business under the same names with catalog sales of new and used musical instruments to customers in several states, including Ohio. Plaintiff has used these marks, "Daddy's" and "Daddy's Junky Music Stores," since 1975 and holds three related U.S. trademark/servicemark registrations: "Daddy's Junky Music Stores," incontestable federal Registration No. 1,359,864, issued September 10, 1985, for retail music store services; "Daddy's," Registration No. 1,594,-679, issued May 1, 1990, for retail music store services; and "Daddy's," Registration No. 1,579,993, issued January 20, 1990, for musical instruments. Plaintiff has also been referred to as "Big Daddy" by the general public.

Focusing on its "Daddy's Junky Mail," and hailing as "World's Largest Dealer of Used Musical Equipment," plaintiff has built a substantial mail order business throughout the United States and advertises in most of the major music industry magazines. Plaintiff has over 1,490 Ohio residents on its mailing list with 381 Ohioans within a 30-mile radius of defendant Big Daddy's Family Music Center. Plaintiff has been very successful with its mail order business in Ohio, with sales of $92,551.00 during the period from February 1995 to July 31, 1995. This success has prompted plaintiff to pursue expansion within the state and plaintiff has entered into preliminary negotiations to purchase a Columbus, Ohio based company engaged in retail musical instrument sales.

**B. Defendant Big Daddy's Family Music Center.**

Defendant "Big Daddy's Family Music Center" is a sole proprietorship located in Delaware, Ohio, engaged in retail sales of new musical instruments since 1993. The name of the store can be traced to its owner Greg "Big Daddy" Houston. Mr. Houston acquired the nickname at the 1991 Chicago Blues Festival and is indeed "big," standing six feet one inch tall and massing approximately 235 pounds.

Defendant has no catalog or mail order business but does have a direct mailing list. Nearly all of the 2,212 individuals on defendant's list reside in Delaware or contiguous counties. Defendant spent $7,625.84 on advertising during the first six months of 1995. This sum went toward the expenses of direct mailings as well as local cable television and newspaper. Defendant gains further exposure through its support of various local philanthropic efforts.

## II.

Plaintiff brought this action against defendant seeking damages and an injunction against further infringement of its registered trademarks. Plaintiff claims that defendant's use of the mark "Big Daddy's Family Music Center" for retail store sales and services for musical instruments constitutes trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, false designation in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition and deceptive trade practices under Ohio law. Both parties have cross filed for summary judgment; plaintiff on the trade infringement claim and defendant on all four claims. "Summary judgment is as appropriate in a trademark infringement case as in any other case and should be granted or denied on the same principles." *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir.1983).

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2515). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

Plaintiff alleges that the defendant's use of the name "Big Daddy's Family Music Center" constitutes trademark infringement and unfair competition under the sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a). The test for trademark infringement pursuant to 15 U.S.C. § 1114 is "whether the alleged infringement of a trade or service mark causes a 'likelihood of confusion' among consumers." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988). "The general concept underlying likelihood of confusion is that the public believes that the mark's owner sponsored or otherwise approved of the use of the trademark." *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir.1983) (internal citations and quotations omitted).

■ Plaintiff also alleges that defendant's use of the name "Big Daddy's Family Music Center" constitutes "false designation," an unfair business practice prohibited by the Lanham Act. 15 U.S.C. § 1125(a). Unfair business practices under the Lanham Act include false designations of origin and false or misleading descriptions or representations of fact. *Id.* The test for unfair competition under § 1125(a) is identical to that for trademark infringement under 15 U.S.C. § 1114, to wit, whether there is a likelihood of confusion among consumers. *See Chrysler Corp. v. Newfield Publications, Inc.,* 880 F.Supp. 504, 509 (E.D.Mich.1995).

■ Lastly, plaintiff alleges that defendant's actions also violate the Ohio Deceptive Trade Practices Act ("DTPA"), Ohio Rev. Code § 4165.02 and Ohio common law trade infringement. Pursuing an action under the DTPA does not preclude a plaintiff from also bringing an action under the common law. *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1431 n. 69 (S.D.Ohio 1990). Both actions resemble a federal claim of trademark infringement in that they require the same analysis given to determination of liability under 15 U.S.C. § 1114(a), namely, whether there is a likelihood of confusion. *See Mister Twister, Inc. v. JenEm Corp.,* 710 F.Supp. 202, 204 (S.D.Ohio 1989); *see also Worthington Foods* at 1431 (addressing comparison between common law trade infringe-ment and the Lanham Act); *Barrios v. Am. Thermal Instruments, Inc.,* 712 F.Supp. 611, 613 (S.D.Ohio 1988) (addressing comparison between DTPA and the Lanham Act).

■ "Likelihood of confusion" is the sole issue before the Court. A purely legal question, *Esercizio v. Roberts,* 944 F.2d 1235, 1242 (6th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992), its presence or absence will be dispositive as to all of plaintiff's various claims. "In assessing the likelihood of confusion, a court's concern is 'the performance of the marks in the commercial context.'" *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1106 (6th Cir.1991) (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1266 (6th Cir.1985)). It is consumer confusion in market conditions and not within the confines of the courtroom which matters.

■ In this vein, the Sixth Circuit has established a six part test which aims to assess likelihood of confusion in light of actual market conditions. These factors include:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 648 (6th Cir.) (citing *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979)), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). These factors are interrelated and merely serve as a guide to determine the likelihood of confusion. *Homeowners,* 931 F.2d at 1107. Moreover, the plaintiff need not address each and every factor in order to prevail. *Wynn Oil,* 839 F.2d at 1186.

### A. Strength of the Plaintiff's Mark.

■ The stronger a plaintiff's mark, the more likely there is to be confusion among

consumers. This factor encompasses a "mark's distinctiveness and degree of recognition in the marketplace." *Homeowners,* 931 F.2d at 1107. In determining the strength of a mark the Court must consider several elements including the mark's incontestability status, *see Wynn Oil,* 839 F.2d at 1187, the type of mark, *see Worthington Foods,* 732 F.Supp. at 1432–33, general customer recognition, *see Homeowners,* 931 F.2d at 1107–08, and the number of other registered marks with the same name. *See id.* at 1108.

■ A primary consideration for the Court is whether the United States Trademark Office has given incontestability status to the trademark at issue. Such status arises following submission by the registrant of proof of continuous use for five years following the date of registration. 15 U.S.C. § 1065. Not only is an incontestable federal trademark conclusive evidence of the validity of the registered mark, *see* 15 U.S.C. § 1115(b), it is also presumptive evidence of strength. *Wynn Oil,* 839 F.2d at 1187 (describing a trademark which has been registered five or more years as "worthy of full protection."); *but see Munters Corp. v. Matsui Am., Inc.,* 909 F.2d 250, 252 (7th Cir.), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990).

In this instance, plaintiff's "Daddy's Junky Music Stores," federal Registration No. 1,359,864, having been in continuous use for a period of five years, is considered incontestable by the USPTO. *See* pl. ex. A. According to *Wynn Oil,* this mark carries a presumption of strength. Plaintiff's other four marks which utilize the word "Daddy's," however, having not reached incontestability status, *see* pl. ex. B, C, are not entitled to any presumption.

■ Another method of assessing strength of the mark is by determining the mark's type. Trademarks fall within one of four types or categories. These categories include: (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, and (4) generic. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 594 (6th Cir.1989). These categories are not absolutely discrete, and the Court's task is to place the trade-mark somewhere within the spectrum. *See Worthington Foods,* 732 F.Supp. at 1433.

■ Fanciful marks, words or design which connotes the good or service alone, *see Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 571 (6th Cir.1987) (describing Exxon or Kodak as fanciful marks), and arbitrary marks, words or designs which bear no independent meaning until attached to its requisite good or service, *see id.* (describing Apple Computer as an arbitrary mark), are the strongest marks.

■ Plaintiff's stronger mark, "Daddy's Junky Music Stores" is an arbitrary mark. The Court in particular notes the interaction between "Daddy's Junky" and "Music Stores." One who was familiar with retail music stores in the Northeast might associate the four words, when combined, to form a recognizable locution. As plaintiff's "Daddy's Junky Music Stores" is arbitrary, it must be considered relatively strong. Plaintiff's other three marks (the "Daddy's" marks) are arbitrary. These marks stand by themselves to represent the provision of services. The "Daddy's" marks therefore must also be considered relatively strong.

■ When considering the strength of a mark, the Court must also consider the markets in which the mark has its greatest recognition and allegiance. *See Homeowners,* 931 F.2d at 1107–08. For example, a mark "may indeed by arbitrary and hence inherently distinctive, yet have little customer recognition or 'strength' in the market, or perhaps have high recognition which is limited to a particular product or market segment." *Id.* at 1107. This includes an analysis of regional strength, that is, exposure in geographical and product areas. *Ameritech, Inc. v. Am. Info. Technologies Corp.,* 811 F.2d 960, 967 (6th Cir.1987) (noting that "[a] mark might be weak in the national market, but might still be strong in the senior user's geographical and product area and thus deserving of protection."); *see also Comidas Exquisitos, Inc. v. O'Malley & McGee's, Inc.,* 775 F.2d 260, 262 (8th Cir.1985) (finding no likelihood of confusion between two "O'Mal-

ley's" restaurants, one in Ames, Iowa, and one in Atlanta, Georgia).

■ In this case, plaintiff has a smattering of customers, approximately 1,500, on its mailing list who live within the entire state of Ohio. Plaintiff operates all of its retail stores in the Northeast. Its exposure to this region comes purely through its mail order business. Plaintiff's marks, therefore, if entitled to a finding of strength, have their most recognition in the Northeast. Lack of a major presence in this state weighs against a finding of strength in this region.

■ Lastly, if there are numerous third-party registrations of the mark, the mark should be considered weaker. *See Homeowners*, 931 F.2d at 1108. "The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion ..." Restatement (First) of Torts § 729 cmt. g (1938). *See also General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir. 1987).

■ The word "Daddy's" is abundant in American nomenclature and not surprisingly there are a significant number of registrations utilizing the word "Daddy's." A search of the USPTO records by defendant revealed fifteen such registered marks with three additional registrations pending. *See* def. ex. C. These additional registrations indicate that plaintiff's "Daddy's" marks should be considered less strong. Defendant does not argue, however, that there are other marks substantially similar to "Daddy's Junky Music Store" and the Court would presume that, given the USPTO's award of indisputability status to plaintiff, there are few if any others.

In summary, the Court finds that plaintiff's three "Daddy's" marks are not strong. They have not reached incontestability status and there are numerous other "Daddy's" registrations. "Daddy's" is not a strong mark.

On the other hand, plaintiff's mark "Daddy's Junky Music Stores" is entitled to a finding of moderate strength. First of all, it is presumptively strong, having been declared incontestable by the USPTO. Although plaintiff's strength is more likely regional, the "Daddy's Junky Music Stores" is an arbitrary mark, a distinction which also warrants a finding of strength. The strength of plaintiff's "Daddy's Junky Music Stores" increases any likelihood of confusion.

## B. Relatedness of the Goods.

■ The second factor the Court must consider is any similarity between the parties' goods and services. The more related the parties' goods are, the more likely it is that consumer confusion will result. In determining how important this factor is to the ultimate determination of likelihood of confusion, the Sixth Circuit has recognized three categories of cases:

> (1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely.

*Homeowners*, 931 F.2d at 1108.

"[S]ervices are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 1109 (internal quotations omitted).[1]

In this instance, both parties sell new musical instruments. Plaintiff also sells used musical instruments.

A first step in analyzing similarity is to examine how the goods or services are classified by the United States Patent and Trademark Office ("USPTO"). *See Little Caesar*, 834 F.2d at 571. The USPTO categories are very broad, *see* 37 C.F.R. § 6.1 ("International Schedule of Classes of Goods and Ser-

---

1. One court has analogized this inquiry to one made to determine monopolization under the Sherman Act, 15 U.S.C. § 2. *See Worthington Foods*, 732 F.Supp. at 1436–39 (examining potential trademark infringement by employing an analysis of submarkets similar to that found in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

vices"), and both parties' products would clearly fall into the "musical instruments (other than talking machines and wireless apparatus)" category. Moreover, plaintiff's stronger mark has been designated by the USPTO to cover "retail music store services" as a whole. *See* "Daddy's Junky Music Stores" Reg. No. 1,359,864.

■ Despite the contentions of defendant, new and used musical instruments are sufficiently similar to one another as to be contained within in one "submarket." *See Worthington Foods*, 732 F.Supp. at 1436–39. If the parties in all other respects had similar marks, advertising, and trade dress, there would be some risk of consumer confusion. *See Homeowners*, 931 F.2d at 1108. The Court finds that the similarity of the goods in which the parties deal increases any likelihood of consumer confusion.

### C. Similarity of the Marks.

■ When assessing the similarity of the marks at issue, the Court "must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Wynn Oil*, 839 F.2d at 1187 (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983)). This standard inquiry vitiates a "side-by-side" comparison, *see Homeowners*, 931 F.2d at 1109, and makes it impermissible for the Court to focus on "prominent" words or symbols to the detriment of the mark as a whole. *See Little Caesar*, 834 F.2d at 571; *General Mills*, 824 F.2d at 627.

■ This is a "pivotal" distinction between plaintiff's "Daddy's Junky Music Stores" and defendant's "Big Daddy's Family Music Center." *See Little Caesar*, 834 F.2d at 571 (holding that "Little Caesar" and "Pizza Caesar" not confusingly similar). The Court will not, as plaintiff urges, concentrate on the "Daddy's" component of both marks. Without this concentration, plaintiff's argument for similarity falls flat. Overall, the marks are very different in sound, appearance and meaning. The word "Daddy's" itself is much too common for plaintiff to claim that defendant's use of this patriarchal term, the sole similarity between the marks, would

confound consumers. *See also ConAgra, Inc. v. Hormel*, 990 F.2d 368, 371 (8th Cir.1993) ("Healthy Choice" and "Health Selections" not confusingly similar marks for similar products); *Long John Distilleries, Ltd. v. Sazerac Co.*, 426 F.2d 1406, 1407 (C.C.P.A. 1970) ("Frier John" and "Long John" not confusingly similar marks for similar products); *Black Dog Tavern Co. v. Hall*, 823 F.Supp. 48, 55 (D.Mass.1993) ("The Dead Dog" and "The Black Dog" not confusingly similar marks for similar products); *Beech–Nut, Inc. v. Warner–Lambert Co.*, 346 F.Supp. 547, 549 (S.D.N.Y.1972) ("Breath Pleasers" and "Breath Savers" not confusingly similar marks for similar products), *aff'd*, 480 F.2d 801 (2d Cir.1973).

Furthermore, if one were to concentrate on one particular word or syllable, it would be "Junky," a word which is, in the Court's opinion, unique and utilized only by plaintiff. Although "Junky" in this context refers to plaintiff's strong connection to its mail order business and its catalogs or "junky mail," *see, e.g.*, pl. ex. H, the typical connotation of the word is something substandard or secondrate. *See* The American Heritage Dictionary of the English Language 710 (1981) (defining "junk" as "[a]nything of inferior quality; something cheap or shoddy"). This is what makes the word unique and worthy of consumer focus. After all, how often is a good or service touted for its "inferiority."

Moreover, the manner in which the marks are displayed is different. Plaintiff utilizes a variety of styles of print, ranging from the upper-case, lower-case block lettering on its "Daddy's Junky Mail" *see, e.g.*, pl. ex. H, to the bulbous italic print used in some of its magazine advertisements. *See* pl. ex. M–O. Plaintiff also occasionally adds a guitar graphic to its mark. *See* pl. ex. L. Defendant, on the other hand, is consistent in its very basic all capitals block lettering, *see* def. ex. D–I, accompanied by the phrase "Music soothes the savage family." *See id.*

Finally, plaintiff's claim that it is often referred to as "Big Daddy's" would not increase any likelihood of consumer confusion. The Court is aware of a number of "Big Daddy's" not the least of whom include Cin-

cinnati Bengals lineman Dan "Big Daddy" Wilkinson, 1960s Speaker of the California Assembly, Jesse "Big Daddy" Unruh, Ugandan dictator and now exile Idi "Big Daddy" Amin, and fictionally, "Big Daddy" in Tennessee Williams' *Cat on a Hot Tin Roof,* often associated with the late Burl Ives' portrayal in the original Broadway production. Greg Houston, proprietor of defendant, like these aforementioned others, has adopted "Big Daddy" as his own personal nickname and is known in the community under this moniker.

Overall, there is little if any similarity between the parties' marks. This lack of similarity significantly diminishes any likelihood of consumer confusion.

### D. Evidence of Actual Confusion.

 Examples of past confusion between parties' marks often foreshadow future consumer confoundment and generally are entitled to great weight in the Court's determination of the likelihood of confusion. *Homeowners,* 931 F.2d at 1110; *Frisch's Restaurants,* 670 F.2d at 648. A complete lack of such evidence, however, will not necessarily preclude the plaintiff's action, *see Wynn Oil,* 839 F.2d at 1188.

On the other hand, there are also certain instances in which a lack of past confusion would weigh against finding a likelihood of confusion. *See Homeowners,* 931 F.2d at 1110 (noting that "[w]here the parties have been doing business in the same area for some time and where they have advertised extensively, isolated instances of actual confusion are not conclusive or entitled to great weight in the determination.").

 Plaintiff has come forward with two examples of alleged confusion. One is a customer who while requesting a catalog of plaintiff mentioned that he was familiar with plaintiff's store in Delaware, Ohio. The store to which he referred was actually defendant's store. *See* pl. decl. at 5. The other example of past confusion cited by plaintiff is a letter sent from Louisiana to plaintiff's New Hampshire address and bearing the name "Big Daddy's." *See* pl. ex. P. The second so-called example of confusion evinces confusion

regarding the name of plaintiff's store, not confusion between plaintiff's and defendant's respective stores. Plaintiff fails to explain how this Louisiana patron would conceivably know of defendant's solitary store located in central Ohio.

The first example of confusion cited by plaintiff, however, is of legitimate concern. It is, nonetheless, but one example of past confusion by anyone who has been identified by plaintiff. Given plaintiff's claims regarding its Ohio sales and its wide advertising foray into the central Ohio market, it is surprising to the Court that if the marks are as similar as plaintiff contends, that there are not more instances of past confusion. *See Homeowners,* 931 F.2d at 1110. Overall, this factor neither increases nor decreases the likelihood of consumer confusion.

### E. Marketing Channels Used.

 This factor "consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners,* 931 F.2d at 1110. The parties' choices in how their services are marketed are an important consideration, particularly when other factors are not as probative, primarily because it shows great insight into the true market forces at play. *See id.* Marketing channels include the type of customers, as well as the marketing context and advertising practices. *See Little Caesar,* 834 F.2d at 572.

 The marketing channels of the parties are almost completely different. Defendant relies on a face-to-face interaction and personal attention in order to make sales. Defendant also does minimal local advertising and has a direct mailing but no catalogue. This mailing goes almost entirely to central Ohio customers. Plaintiff's forte, on the other hand, is its mail order and catalogue business. Plaintiff relies on a national advertising blitz and its substantial selection of musical instruments to attract business. Plaintiff's "bigger is better" style contrasts greatly with defendant's attention to local demands. The different marketing styles employed by the parties greatly lessens any likelihood of confusion.

## F. Likely Degree of Purchaser Care.

The less attention a consumer gives to the purchase of the services at issue, the greater the likelihood of confusion between marks. *Wynn Oil,* 839 F.2d at 1188. Generally, it is the perspective of the "reasonably prudent buyer" from which the Court must initiate any analysis into the likely degree of purchaser care. *Worthington Foods,* 732 F.Supp. at 1448.

This degree of care will vary, however, depending on the type of consumer and the type of product. For instance, younger consumers tend to display less care. *See Chrysler Corp.,* 880 F.Supp. at 510 (finding minimal care exercised by targeted consumers of baseball cards, boys between the ages of 8 and 14). Similarly, if the product is inexpensive or subject to "impulse buying," consumers tend to be more nonchalant. *See Little Caesar,* 834 F.2d at 572 (finding minimal consumer care in the market for takeout food); *Frisch's Restaurants,* 670 F.2d at 648 (same). On the other hand, if the goods are sold primarily to professionals, *see Worthington Foods,* 732 F.Supp. at 1448, or the services are "expensive or unusual," *Homeowners,* 931 F.2d at 1111, consumers tend to exercise a greater degree of care.

Despite plaintiff's contentions, purchasers of the parties' goods and services are likely to demonstrate an enhanced degree of care. Both parties deal in a substantially similar class of goods, *see* discussion *supra,* which on average are quite expensive. *See, e.g.,* pl. ex. J at 3 ("Daddy's Junky" catalogue offering a used Fender 65 Jaguar Deluxe electric guitar for $849.99); def. ex. I ("Big Daddy's Family Music Center" direct mail advertising offering a new Crate 80 watt guitar amp for $275.00). Such goods are not typically purchased on a whim. These are guitars and violins, not cheeseburgers or pizzas. *See Little Caesar,* 834 F.2d at 572. Care on the part of the parties' likely consumers significantly decreases the likelihood of consumer confusion.

## G. Intent of Defendant in Selecting the Mark.

Intentional adoption of a mark in light of another's trademark may be suffi-cient in and of itself to justify an inference of consumer confusion. *Frisch's Restaurants,* 670 F.2d at 648–49. After all, "a defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks there is at least a possibility that he can divert some business from the senior user." *Little Caesar,* 834 F.2d at 572. Courts are disinclined to presume intent in these matters, instead seeking some evidence of "larcenous intent" or at least actual knowledge of the first mark's existence. *Id.*

A complete lack of direct evidence, however, will not necessarily preclude the plaintiff's action. "[I]ntent to copy is not a requirement of a Lanham Act action." *Worthington Foods,* 732 F.Supp. at 1449.

Plaintiff has no direct evidence that defendant was acquainted with plaintiff's mark, let alone that defendant intended to mimic plaintiff's mark in some deceitful appellative venture. Plaintiff instead contends that intent may be presumed from the mere existence of plaintiff's mark and its exposure to the marketplace. *See, e.g., Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 365 (6th Cir.1984) (analyzing intent from plaintiff's market exposure).

The Court is not prepared to accept plaintiff's position which in essence postulates that "first in time" always prevails. Mere presence in the marketplace does not mean that an allegedly similar mark was established with an intent to parrot the first mark. This is an example of mere presence. The Court finds that plaintiff's market exposure is inadequate to place defendant on notice. *See id.* Moreover, defendant has a very legitimate reason for selecting its name. Greg Houston, the proprietor of defendant, goes by "Big Daddy" and has since the 1991 Chicago Blues Festival. Overall, this lack of intent decreases the likelihood of consumer confusion.

## H. Likelihood of Expansion of the Product Lines.

Finally, in assessing the likelihood of confusion, the Court will consider plaintiff's

potential expansion of its products. A "strong possibility" that either party will expand his product lines or enter into similar marketing channels weighs in favor of a finding of likelihood of confusion. *Homeowners,* 931 F.2d at 1112 (citing Restatement (First) of Torts § 731(b) (1938)).

 While plaintiff claims to have entered into preliminary negotiations to purchase a Columbus company engaged in retail musical instrument sales, these plans are too speculative for the Court to attribute them much weight in the analysis. The court in *Worthington Foods* was confronted with a similar scenario: "Although Worthington claims it will be purchasing a company making a ready-to-eat cereal [the same product market as defendant] named 'Ruskets,' it has not come forward with a signed purchase agreement." *Worthington Foods,* 732 F.Supp. at 1450.

Plaintiff's speculative plans to enter the central Ohio musical instrument market are not entitled to significant weight in determining whether there is any likelihood of confusion. Again, this factor neither increases nor decreases the likelihood of consumer confusion.

#### IV.

 After a thorough analysis of the Sixth Circuit factors, the Court finds no likelihood of confusion between the parties' marks. Plaintiff has one relatively strong mark, "Daddy's Junky Music Stores," but plaintiff's "Daddy's" marks are weak with several other similar marks already registered. Although the parties offer similar goods, they have differing marketing styles. Plaintiff has exposure in this region solely through its mail order business, while defendant concentrates on its "hands-on" retail trade. The parties' marks bear no similarity to each other aside from the mere use of the word "Daddy's" which the Court finds insignificant. The parties sell expensive specialty goods which belie a high degree of consumer sophistication and care. Moreover, defendant has a legitimate reason for selecting its mark given its proprietor's "girth" of experiences.

All in all, the above factors combined with the lack of significant examples of past confusion and plaintiff's speculative plans to expand into the central Ohio musical instrument market make plaintiff's claim of infringement untenable. The cumulative effect of these factors requires a finding that, as a matter of law, no likelihood of consumer confusion exists. Defendant is entitled to summary judgment on plaintiff's claim of trade infringement.

The Court's finding that no likelihood of confusion is also dispositive on plaintiff's remaining three claims. Plaintiff's second claim is one of false designation. *See* 15 U.S.C. § 1125(a). Part of the prima facie case of false designation requires the plaintiff to show that the trade dress of the competing products was confusingly similar. *Kwik–Site Corp. v. Clear View Mfg. Co., Inc.,* 758 F.2d 167, 178 (6th Cir.1985); *see also Chrysler Corp.,* 880 F.Supp. at 509. Plaintiff is foreclosed as a matter of law from proving this confusing similarity in light of the Court's above finding. Defendant is therefore entitled to judgment as a matter of law on plaintiff's claim of false designation.

Plaintiff's remaining claims resound in Ohio's common law trademark infringement and Ohio's Deceptive Trade Practices Act ("DTPA"). As noted previously, both actions resemble a federal claim of trademark infringement in that they require the same analysis given to determination of liability under 15 U.S.C. § 1114(a), namely, whether there is a likelihood of confusion. *See Mister Twister,* 710 F.Supp. at 204; *Barrios,* 712 F.Supp. at 613. Plaintiff is foreclosed as a matter of law from proving a likelihood of confusion in light of the Court's above finding. Defendant is therefore entitled to judgment as a matter of law on plaintiff's claims of common law trade infringement and violations of the DTPA.

#### V.

Based on the above, the Court **Grants** defendant's summary judgment motion (Doc. 12) and **Denies** plaintiff's summary judgment motion (Doc. 10).

The Clerk shall enter a final judgment in this case in favor of defendant Big Daddy's

Family Music Center, and against plaintiff Daddy's Junky Music Stores, dismissing plaintiff's claims with prejudice.

**The Clerk shall remove this action from the Court's pending cases list.**

**IT IS SO ORDERED.**