DADDY'S JUNKY MUSIC STORES, INC., Plaintiff–Appellant,

v.

BIG DADDY'S FAMILY MUSIC CENTER, Defendant–Appellee.

No. 96–3255.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1997.

Decided March 14, 1997.

278

Gail L. Morrissey, argued and briefed, Standley & Gilcrest, Dublin, OH, Eleanor M. Musick, Kathleen A. Pasulka, Brown, Martin, Haller & McClain, San Diego, CA, for Plaintiff–Appellant.

David A. Yost (argued and briefed), Delaware, OH, for Defendant–Appellee.

Before: KENNEDY, NELSON, and GODBOLD *, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiff appeals the order of the District Court granting summary judgment in favor of defendant and dismissing its federal claims of trademark infringement and false designa-

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Elev-

tion and state law claims of trademark infringement and deceptive trade practices. The District Court based its decision on a finding as a matter of law that there is little likelihood that consumers will become confused between the origin of the goods protected by plaintiff's trademarks and defendant's goods by reason of its use of the marks complained of. For the following reasons, we REVERSE the order of the District Court and find that there are genuine issues of material fact regarding whether a likelihood of confusion exists.

## I. Procedural History and Facts

Plaintiff owns a chain of thirteen retail stores scattered throughout the Northeast, selling new and used musical instruments and related equipment. In addition to its retail stores, plaintiff maintains a national catalog and mail order business, through which it also sells new and used instruments and equipment. Plaintiff further advertises in several major music industry magazines.

Plaintiff holds three related U.S. trademark/service mark registrations: Registration No. 1,359,864, issued on September 10, 1985, for the mark "Daddy's Junky Music Stores," for retail music store services; Registration No. 1,594,679, issued on May 1, 1990, for the mark "Daddy's," for retail music store services; and Registration No. 1,579,993, issued on January 30, 1990, for the mark "Daddy's," for musical instruments. Plaintiff has used these marks in connection with its store and catalog business since 1975. Plaintiff entitles its extensive catalog, replete with thousands of listed items and accompanying prices, as "Daddy's Junky Mail."

Plaintiff mails its catalog to over 1,490 residents of Ohio; 381 of these individuals live within thirty miles of the store of defendant. Between February and July, 1995, plaintiff had about $92,551 in catalog sales in Ohio. Although plaintiff does not operate a store in Ohio, it has pursued preliminary negotiations to purchase a Columbus, Ohio company with four musical instrument retail

enth Circuit, sitting by designation.

stores. One resident of Ohio, when requesting a catalog from plaintiff over the telephone, mentioned that he was familiar with plaintiff's store in Delaware, Ohio. The store to which the customer referred was actually the store of defendant.

Since 1993, defendant has existed under the laws of the State of Ohio as a retail store entitled "Big Daddy's Family Music Center" in Delaware, Ohio, selling musical instruments and related equipment.[1] Greg Houston, the owner of defendant, named the store by using his own nickname, "Big Daddy," which he acquired during the 1991 Chicago Blues Festival. Defendant sells primarily new electronic instruments, but it also sells some used instruments and some traditional band instruments.

Although defendant does not maintain a catalog or mail order business, it does send direct mailings to 2,212 people, nearly all of whom reside in Delaware or contiguous counties. These single-page mailings generally consist either of announcements of music-related events organized by the store for the community and its own commercial purposes, or of advertisements listing goods and their prices. Defendant spent $7,625.84 on advertising during the first six months of 1995, spending about a quarter of this sum on its direct mailings and the rest on local cable and newspaper ads and other expenses. In its advertisements and mailings, defendant presents itself as "Big Daddy's Family Music Center," "Big Daddy's Music," "Big Daddy's," and "Big Daddy." Defendant further markets itself by becoming involved in various local community causes.

Plaintiff filed its complaint in this case on March 29, 1995. In its complaint, plaintiff alleged that the use by defendant of its name "Big Daddy's Family Music Center" constitutes trademark infringement and false designation under the Lanham Act. See 15 U.S.C. §§ 1114 and 1125(a). The complaint further alleged a claim of state common law trademark infringement and a claim under the Deceptive Trade Practices Act ("DTPA")

of Ohio. See OHIO REV.CODE ANN. § 4165.02 (Anderson 1991).

Plaintiff filed a motion for partial summary judgment on August 24, 1995, requesting judgment as a matter of law on its federal trademark infringement claim. Defendant in turn filed a motion for summary judgment against every claim in the complaint on August 31, 1995. Both parties essentially contested in their motions whether there is a likelihood that consumers will be confused between the marks of plaintiff and the names used by defendant.

On January 31, 1996, the District Court granted the summary judgment motion of defendant. See Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr., 913 F.Supp. 1065 (S.D.Ohio 1996). The District Court found that, as a matter of law, there is no likelihood of confusion between the marks of the parties. Plaintiff filed this timely appeal of the judgment against it.

## II. Standard

The parties contest the standard of review to be applied. Plaintiff asserts that we should review the factual findings of the District Court under a clearly erroneous standard, but review de novo the final legal conclusion of the District Court that those foundational facts collectively fail to demonstrate a likelihood of confusion. In contrast, defendant insists that the clearly erroneous standard applies to every ruling by the District Court, including the ultimate finding of no likelihood of confusion.

Both parties suggest an improper standard. Plaintiff is correct to the extent that a decision following a bench trial regarding likelihood of confusion constitutes a mixed question of fact and law which the Sixth Circuit reviews for clear error when examining the underlying factual findings, but reviews de novo when determining whether those findings overall reveal a likelihood of confusion. See, e.g., Champions Golf Club, Inc. v. Champions Golf Club, Inc., 78 F.3d 1111, 1116 (6th Cir.1996). The District

---

1. Although the pleadings fail to explain fully what defendant is, we note that Ohio law allows an individual to do business under a fictitious name. See OHIO REV.CODE ANN. § 1329.01(C) (Anderson 1993).

Court, however, did not conduct a bench trial; rather, it decided this case solely on the basis of cross-motions for summary judgment. We therefore apply an entirely *de novo* standard of review to this appeal, just as we would to any other grant of summary judgement. *See WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1086 (6th Cir.1983)(traditional principles of summary judgment apply in trademark infringement cases); *see also Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1104 (6th Cir.1991)(applying *de novo* standard of review to grant of summary judgment on federal trademark claim). We therefore may affirm the grant of summary judgment to defendant only if the record, when viewed in the light most favorable to plaintiff, contains no genuine issue of material fact. *See, e.g.,* FED.R.CIV.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. Federal Trademark Infringement Claim

Plaintiff alleges a claim of trademark infringement under the Lanham Act. *See* 15 U.S.C. § 1114. The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. *See, e.g., id.* at § 1114(1); *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 361 (6th Cir.1984). When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

*See, e.g., Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 648 (6th Cir. 1982)("*Frisch I*"). When applying these factors to a given case, a court must remember that

[t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

*Homeowners Group,* 931 F.2d at 1107 (footnote omitted).

### A. Strength of the marks

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985)("*Frisch II*"). A mark is strong and distinctive when "the public readily accepts it as the hallmark of a particular source;" such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both. *See id.* (quoting 3A RUDOLPH CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES ¶ 20.43 (4th ed. 1983)).

### 1. Arbitrariness of marks

When assessing its strength, a court will place a trademark into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary. *See Champions Golf Club,* 78 F.3d at 1116–17. These categories constitute a spectrum of increasing strength and are not perfectly discrete. *See id.* Fanciful or arbitrary marks are the strongest and most distinctive. *See id.* at 1117. An "arbitrary" mark has "'a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached,' such as CAMEL cigarettes or APPLE computers." *Id.* (quoting *Little Caesar*

*Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987)). Assigning a category to a mark constitutes only a single step in determining the strength of the mark. *See Homeowners Group*, 931 F.2d at 1107.

■ The District Court found that the "Daddy's Junky Music Store" and the "Daddy's" marks are arbitrary marks. *See* 913 F.Supp. at 1071. The parties do not contest this particular conclusion, and we similarly agree that it is correct as matter of law: the phases "Daddy's" and "Daddy's Junky," although consisting of words with recognized meaning in everyday speech, do not have any inherent connection with the sale of musical instruments. The District Court therefore properly found that the marks of plaintiff draw strength from their arbitrary nature. *Cf. Genny's Diner & Pub, Inc. v. Sweet Daddy's, Inc.*, 812 F.Supp. 744, 746–47 (W.D.Ky.1993)(*"Sweet Daddy"* is an arbitrary mark for fastfood product).

Additional rulings by the District Court regarding the strength of plaintiff's marks, however, contain errors which require reversal of the grant of summary judgment to defendant.

## 2. Existence of similar third-party registrations

■ The District Court held that the "Daddy's" marks lack strength because defense counsel stated in an affidavit that a search of the records of the United States Patent and Trademark Office revealed fifteen registered marks which use the phrase "Daddy's," as well as three such marks pending for registration. *See* 913 F.Supp. at 1072. The District Court justified this decision by citing *Homeowners Group*, 931 F.2d at 1108, for the proposition that numerous third-party registrations of identical or similar marks undermine the strength of a mark. *See* 913 F.Supp. at 1072. The affidavit submitted by defense counsel, however, merely states that these registrations "identified a variety of different goods and services;" it does not explain whether any of these registrations specifically relate to the retail sale of musical instruments. As the *Homeowners Group* court itself stated, "merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens in the marketplace." 931 F.2d at 1108. Although the *Homeowners Group* court found that numerous third-party registrations were entitled to some probative weight because they appeared to be current and in current use, the registrations included several real estate related firms, the very industry at issue in *Homeowners Group*. *See id.*

Consequently, it remains a genuine issue of fact whether the existence of fifteen other registered marks incorporating the phrase "Daddy's" weakens plaintiff's marks for the specific purpose of retail sales of musical instruments. *See National Cable Television Assoc., Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1579–80 (Fed.Cir.1991)(although frequent third-party registrations may reduce the strength of a common mark, they do not do so if they "are [not] nearly as closely related to the activities of the parties as the virtually identical uses of [the marks by] the parties are to each other"); *cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir.1980)(although mark for sugar and sugar-related products of plaintiff is distinctive and well-known, existence of seventy-two third-party registrations of same mark demonstrates that strength of mark is limited to particular use to which plaintiff already has put it).

■ The District Court likewise stated that the "Daddy's" marks lack strength because the phrase "Daddy's," standing alone, is "abundant in American nomenclature." *See* 913 F.Supp. at 1072. It is true that the more common a word or phrase is, the less inherent trademark strength it may have, even when the mark has an arbitrary relation to the good or service to which it applies. *See Amstar Corp.*, 615 F.2d at 260 (although application of word "Domino" to sugar is arbitrary, mark enjoys only limited protection beyond sugar and related food products in part because the word "Domino" is extremely common). Again, however, a reduction in the strength of a mark due to its frequent registration or usage in the English

language generally occurs only if the products and services of the parties are different. *See National Cable,* 937 F.2d at 1579–80; *Amstar Corp.,* 615 F.2d at 260. Accordingly, the District Court also should reevaluate upon remand how the common nature of the phrase "Daddy's" affects the strength of plaintiff's marks.

### 3. Incontestability of marks

A trademark becomes "incontestable" if it is not successfully challenged within five years of its registration. *See* 15 ·U.S.C. § 1065. "As the Supreme Court ... concluded in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), an infringement action may not be defended on the grounds that a mark is merely descriptive, if that mark has met the requirements of incontestability." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988)("*Wynn Oil I*"). Therefore, an incontestable mark "is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Wynn Oil Co. v. American Way Serv. Corp.,* 943 F.2d 595, 600 (6th Cir.1991)("*Wynn Oil II*")(quoting *Dieter v. B & H Indus.,* 880 F.2d 322, 329 (11th Cir. 1989)). Although incontestable status constitutes conclusive evidence that a mark is valid, *see* 15 U.S.C. § 1115(b), an incontestable mark still can be an infringing mark. *See id.*

The District Court found that because defendant had used it continuously for a period of five years, the "Daddy's Junky Music Store" mark is incontestable and therefore carries a presumption of strength. *See* 913 F.Supp. at 1071. Conversely, the District Court found that the "Daddy's" marks were not incontestable and therefore not entitled to any presumption of strength. *See id.*[2]

We believe the District Court erred in reducing the strength of the "Daddy's" marks on the basis that they had not achieved incontestable status. As noted, for the purposes of assessing the strength of a mark during an infringement action, incontestable status serves to confer upon a mark

the strength accorded to a descriptive mark with secondary meaning. Accordingly, incontestable status benefits those marks which otherwise would lack inherent strength, i.e., generic marks or descriptive marks without secondary meaning. In the instant case, as arbitrary marks the marks of ·plaintiff already have as much or more strength than descriptive marks. If the "Daddy's Junky Music Store" mark is incontestable, it is unlikely that it thereby improves upon its inherent strength as an arbitrary mark; likewise, if the "Daddy's" marks are contestable, they nonetheless do not lose the strength which flows from their arbitrary nature.

### 4. Consumer recognition

Finally, the District Court found that the marks of plaintiff are less strong to the extent that their consumer recognition is restricted mainly to the Northeast. *See* 913 F.Supp. at 1071–72. The record contains evidence which would support this conclusion, and the District Court was correct that the strength of a mark can vary geographically. *See Ameritech, Inc. v. American Info. Techs. Corp.,* 811 F.2d 960, 967 (6th Cir. 1987). Nonetheless, the evidence regarding the amount of sales done in Ohio by plaintiff indicates that both the degree of consumer recognition of the marks of plaintiff and its ultimate effect upon the strength of those marks remain an issue of fact.

### B. Relatedness of the goods

Cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely. *See, e.g., Champions Golf Club,* 78 F.3d at 1118. Services and goods

---

**2.** Whether the "Daddy's" marks are still contestable is unclear, because defendant has been using them since January and May, 1990, a period·

of over five years. As explained, however, their actual status may be·irrelevant in this case.

"are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group*, 931 F.2d at 1109. "The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Id.* (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir.1963)). Similarly, courts must examine whether the products of the parties perform the same function, concentrating on "whether consumers will be confused as to the origin of the product." *Wynn Oil I*, 839 F.2d at 1187 (holding that bulk car wax and complete car washing service of one party and car care products of other party offered consumers the fundamentally same thing: a clean car).

▇▇ The District Court found that, although plaintiff concentrates on selling *used* instruments and defendant does not, the fact that both parties sell retail musical instruments increases the likelihood of confusion. *See* 913 F.Supp. at 1073.[3] The overlap of the goods and services offered by both parties, especially their emphasis on electronic instruments, does support the conclusion that some potential consumers of one party could fulfill their needs by buying instead from the other party.

### C. Similarity of the marks

▇▇▇ Similarity of marks is a factor of considerable weight. *See Champions Golf Club*, 78 F.3d at 1119. When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks. *Wynn Oil I*, 839 F.2d at 1188. "The appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions." *Homeowners Group*, 931 F.2d at 1106. Rather, courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks

"may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark." *Wynn Oil I*, 839 F.2d at 1188 (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976)). Moreover, courts must view marks in their entirety and focus on their overall impressions, not individual features. *See Homeowners Group*, 931 F.2d at 1109; *see also Little Caesar*, 834 F.2d at 571 (emphasis on the "prominent" feature of a mark and not on its totality violates the rule against comparing component parts of "dissected" marks); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.15[1][a] (perm. ed. rev. vol. 1995)("the overall impression created by a mark from the ordinary shopper's cursory observation in the marketplace ... will or will not lead to a likelihood of confusion, not the impression created from a meticulous comparison as expressed in carefully weighed analysis in legal briefs").

▇▇ The District Court ultimately determined that the parties' marks bear little similarity to each other, and that this finding significantly reduced the likelihood of confusion. *See* 913 F.Supp. at 1074. The District Court, however, essentially ignored the "Daddy's" marks when assessing similarity. *See id.* at 1073–74. Although the District Court properly refrained from concentrating exclusively on the "Daddy's" component when comparing "Daddy's Junky Music Store" with "Big Daddy's Family Music Center," the phrase "Daddy's" is not merely a *component* of the "Daddy's" marks: it *is* the marks. The failure to fully consider "Daddy's" alone was especially detrimental to the extent that defendant presents itself as "Big Daddy's Music," "Big Daddy's," and "Big Daddy," all of which are more similar to "Daddy's" than is the full name of defendant. *See* McCarthy, at § 23.15[8] ("The common propensity to abbreviate names can contribute to a finding of likely confusion when parties drop qualifying words, leaving only the confusingly similar root terms").

---

**3.** The District Court did not state specifically whether it found that the parties "compete directly" or that their goods are "somewhat related."

The District Court may have failed to consider the "Daddy's" marks when examining the factor of similarity because it previously decided that the phrase "Daddy's" is so common that it cannot be a strong mark. As noted, however, it was error to dismiss the "Daddy's" marks as necessarily weak. Upon remand, the District Court must compare every mark of plaintiff with each name used by defendant.[4]

Plaintiff suggests that "Daddy's" is just as similar to "Big Daddy's Family Music Store" as it is to "Big Daddy's" because the phrase "Family Music Store" is too general to contribute any distinguishing elements to the full name of defendant's store. *See, e.g., Induct–O–Matic,* 747 F.2d at 361 (addition of weak and nondistinctive terms does little to reduce likelihood of confusion). The degree of similarity between "Daddy's" and "Big Daddy's Family Music Store," however, remains an issue of fact. We note in passing that "Family" is a more particularized word which, to some degree, helps to distinguish the full name of defendant's store.

### D. Evidence of actual confusion

■ "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil I,* 839 F.2d at 1188. Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 914 (Fed.Cir.1984)); *see also Wynn II,* 943 F.2d at 601–02 (holding the same and upholding finding that absence of actual confusion deserved little weight). Nonetheless, isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite. *See Home-*

*owners Group,* 931 F.2d at 1110; *cf. Champions Golf Club,* 78 F.3d at 1120 (stating in dicta that "four incidents [of actual confusion] is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion").

■ The District Court found that plaintiff had presented unrebutted evidence of one instance of actual confusion. Specifically, a consumer, when requesting a catalog, mentioned to a representative of plaintiff that he was familiar with plaintiff's store in Delaware, Ohio. The store in fact was defendant's store. Although the District Court stated that this example of confusion was of "legitimate concern," it ultimately found that it neither decreased nor increased the likelihood of confusion because it was only a single instance. *See* 913 F.Supp. at 1074.

The District Court was correct to the extent that the record demonstrates as a matter of law that there has been at least one instance of actual confusion. It was error, however, to find that this example cannot increase the likelihood of confusion. This case lacks unusual circumstances indicating that more evidence of actual confusion would have surfaced if the marks at issue really were confusingly similar. Although the District Court emphasized the years that the parties have been in business and the fact that plaintiff has 1,490 Ohio residents on its mailing list, there is no evidence that the same individuals who receive plaintiff's mailings also receive defendant's mailings. If such evidence were present, the District Court might have been correct that the single instance of actual confusion in this case necessarily exerts only a neutral effect. Bearing in mind that a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent. The District Court therefore should

---

4. The District Court also found that, if the long mark of plaintiff has a most significant word, it is "Junky." Although assigning greater weight to a dominant feature of a mark is permissible, *see* McCarthy, at § 23.15[3], and although the word

"Junky" presumably lessens the similarity between the long mark of plaintiff and the full and abbreviated names of defendant, the effect of the word "Junky" is ultimately a factual issue.

reevaluate upon remand the significance of the single instance of actual confusion. *Cf. Induct–O–Matic,* 747 F.2d at 367 (district court should reconsider upon remand the alleged insignificance of lack of evidence of actual confusion; although no confusion had come to light within a twenty-one year period, Trademark Examiner initially had refused to register alleged infringer's mark due to perceived likelihood of confusion).

### E.  Marketing channels used

■ The fifth factor requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services. *See Homeowners Group,* 931 F.2d at 1110. Further, a court must determine whether the marketing approaches employed by each party resemble each other. *See id.; see also Wynn Oil I,* 839 F.2d at 1188 (national marketing effort of one party inevitably overlapped opponent's local advertising campaign to some degree, although overlap probably would not increase likelihood of confusion significantly); *Little Caesar,* 834 F.2d at 572 (6th Cir.1987)(sophisticated and televised advertising campaign by national fast-food chain was "quite different" from far less sophisticated advertising by small, local fast-food business).

■ The District Court decided that "[t]he marketing channels of the parties are almost completely different," and that this difference "greatly lessens any likelihood of confusion." *See* 913 F.Supp. at 1074. The District Court based this conclusion upon its findings that defendant relies upon personal interaction and direct mailings to local customers, whereas plaintiff primarily relies on a sweeping national mail order and catalog business in the geographic area where the parties' customers overlap. *See id.*

It is true that plaintiff has no store in Ohio and that defendant does. Nonetheless, the marketing techniques of the parties converge to the extent that plaintiff mails catalogs to 1,490 residents of Ohio, 381 of whom live within thirty miles of defendant, and defendant similarly mails advertisements to 2,212 residents of central Ohio. Although the catalogs of plaintiff differ from the advertisements of defendant in that they are many pages in length and require orders through the fax, mail, or telephone, the mailings of both parties list musical instruments and their respective prices. Further, the record contains evidence indicating that both parties sell similar instruments, especially electric instruments, at similar prices, which is evidence that there is an overlap between the parties' types of customers.

All the above considerations dictate that material issues of fact remain regarding the degree of similarity between the parties' marketing channels. Finally, even if the District Court reaches upon remand the same factual conclusions which it reached when disposing of the summary judgment motions, it should reconsider whether these facts "greatly lessen[ ] any likelihood of confusion."

### F.  Likely degree of purchaser care

The degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion.

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners Group,* 931 F.2d at 1111. For example, home buyers will display a high degree of care when selecting their real estate brokers, *see id.,* whereas consumers of fast-food are unlikely to employ much care during their purchases. *See Little Caesar,* 834 F.2d at 572; *Frisch I,* 670 F.2d at 648. The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors. *Cf. Little Caesar,* 834 F.2d at 572 (correct finding of low degree of purchaser care "probably makes little difference on the facts before us").

The District Court found that "purchasers of the parties' goods and services are likely to demonstrate an enhanced degree of care" because the instruments sold by the parties generally are expensive and not bought on a whim. See 913 F.Supp. at 1075. This conclusion is certainly correct; as the District Court noted, the cost of some of the instruments can approach one thousand dollars. The District Court also stated, however, that the likely degree of purchaser care "significantly" decreases the likelihood of consumer confusion. See id. We believe that this conclusion may overstate the likely effect of the sixth factor in this case. The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue. If the District Court ultimately determines that the marks are not very similar, then even a high degree of purchaser care will decrease only slightly the already low likelihood of confusion. Similarly, if the District Court finds that the marks are quite similar, then purchaser care will decrease the likelihood of confusion only minimally because the care and skill which a purchaser will have used when deciding which instrument to buy will not have necessarily extended to his decision regarding which retailer to buy from. That is, confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party. See Champions Golf Club, 78 F.3d at 1120–21 (district court accorded disproportionate significance to high degree of purchaser care; sophisticated consumers who paid $15,000 fee to join golf clubs at issue still might believe that clubs were affiliated because the marks and goods at issue were identical); see also Induct–O–Matic, 747 F.2d at 364–65 (cautioning that "[b]eing skilled in their own art does not necessarily preclude [consumers from] mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field")(quoting Wincharger Corp. v. Rinco, Inc., 49 C.C.P.A. 849, 297 F.2d 261, 264 (C.C.P.A.1962)). Upon remand, the District Court should reevaluate the weight accorded to the enhanced degree of purchaser care at issue.

## G. Intent of defendant

Plaintiff alleges that defendant intentionally copied its marks. "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." Homeowners Group, 931 F.2d at 1111; see also Esercizio v. Roberts, 944 F.2d 1235, 1242 (6th Cir.1991)(holding the same). Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user. See Little Caesar, 834 F.2d at 572. Direct evidence of intentional copying is not necessary to prove intent. See Wynn Oil II, 943 F.2d at 603. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. See id. Further, the extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark. See id. at 603–04 (finding by district court that defendant intentionally copied was not clearly erroneous, despite testimony that defendant had not known of plaintiff's mark, when defendant had "intimate knowledge" of the industry and plaintiff had advertised its mark widely and had used it for many years).

The District Court found that the record contains no evidence that defendant intentionally mimicked plaintiff's marks. See 913 F.Supp. at 1075. Rather, the District Court determined that the only evidence regarding the intent of defendant indicates that the proprietor of defendant named the store after his own nickname. See id. Further, the District Court ruled that the prior existence of plaintiff's marks and their market exposure were insufficient to support an inference of intentional copying. See id.

Plaintiff complains that the record contains circumstantial evidence that defendant intentionally copied its marks. Plaintiff is incorrect to the extent that it is suggesting that the mere prior existence of a registered

mark demonstrates that the alleged infringer intentionally copied that mark; otherwise, presumably all trademark infringement cases could result in a finding of intentional copying. Plaintiff, however, is correct that the evidence regarding its market presence constitutes some circumstantial evidence that defendant was aware of its marks. Specifically, the record reveals that plaintiff had $92,551 in sales from its catalog business in Ohio between February and July, 1995, and that it has 1,490 residents of Ohio on its mailing list, including 381 individuals within a thirty-mile radius of defendant. Further, such awareness, if proven, can support an inference of intentional copying. *See, e.g., Wynn Oil II,* 943 F.2d at 603.

Admittedly, the evidence which could support a finding of intentional copying is slight. Nonetheless, this appeal comes before us upon a grant of summary judgment, and the record contains sufficient facts to create an issue regarding whether the owner of defendant knew of plaintiff's marks and intentionally patterned the name of defendant after them. *See Champions Golf Club,* 78 F.3d at 1121 (despite strong evidence of lack of intent, including several independent reasons articulated by owner of defendant for his choice of mark, intent remained an issue because owner of defendant may have known of plaintiff's prior use of mark); *but cf. Induct-O-Matic,* 747 F.2d at 365–66 (finding by district court that defendant intentionally copied mark was clearly erroneous because evidence showed only that defendant knew of plaintiff itself and plaintiff had less than $160,000 in annual sales of trademarked equipment in state of defendant; plaintiff's mark at issue, however, differed from the name of plaintiff).

■ Much more importantly, even if the District Court correctly had ruled as a matter of law that defendant did not copy plaintiff's marks intentionally, the District Court misunderstood the legal significance of this lack of intent by finding that it decreased the likelihood of consumer confusion. *See* 913 F.Supp. at 1075. As noted, the *presence* of intent can constitute strong evidence of confusion. *See, e.g., Homeowners Group,* 931 F.2d at 1111. The converse of this proposi-

tion, however, is not true: the *lack* of intent by a defendant is "largely irrelevant in determining if consumers likely will be confused as to source." *Wynn Oil I,* 839 F.2d at 1189 (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986)); *see also Champions Golf Club,* 78 F.3d at 1121 (holding the same). Intent therefore is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer. Accordingly, if the District Court again determines upon remand that defendant had only good intentions in adopting its name, it must find that this lack of intent neither reduces nor increases the probability of consumer confusion.

## H. Likelihood that product lines will expand

■ Plaintiff asserts that it may expand its product line in central Ohio. "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group,* 931 F.2d at 1112 (citing RESTATEMENT OF TORTS § 731(b) & comment c (1938)). A geographic expansion or an increase in the types of products or services offered can be relevant. *See id.* A finding that the parties will not expand their markets significantly, however, "does not address" the ultimate issue of likelihood of confusion. *See Champions Golf Club,* 78 F.3d at 1122 (quoting *Wynn Oil I,* 839 F.2d at 1189). "Thus, as with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." *Id.*

■ The record shows, and the District Court found, that plaintiff has participated in preliminary negotiations regarding the possible purchase of a company in Columbus, Ohio which operates a chain of four music stores. Because it found that this potential purchase was too speculative to deserve much weight, however, the District Court ruled that analysis of the eighth factor neither increased nor decreased the likelihood of confusion. *See* 913 F.Supp. at 1076. The

District Court cited *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1450 (S.D.Ohio 1990), in which the lack of a signed purchase agreement expanding the product line, as well as the fact that there was no evidence that an expanded product line would bear the protected mark at issue, showed an unlikelihood of product line expansion. The *Worthington Foods* court, however, was deciding only whether to issue a preliminary injunction; it was not deciding the merits of a case during summary judgment. *See id.* Moreover, if plaintiff does execute the sale at issue *and* renames the purchased stores by using one of its marks, plaintiff will not only have expanded geographically but also will have decreased the difference between the marketing channels employed by the parties because plaintiff no longer will be relying solely on mail order catalogs in Ohio. Although the record does not demonstrate necessarily a strong possibility of product line expansion by plaintiff, it does contain an issue of fact regarding expansion.

### IV. Remaining Claims

 The complaint also alleges that defendant is committing false designation under the Lanham Act, *see* 15 U.S.C. § 1125(a), violating the prohibition under Ohio common law against trademark infringement, and violating the Deceptive Trade Practices Act ("DTPA") of Ohio. *See* OHIO REV.CODE ANN. § 4165.02 (Anderson 1991). The District Court correctly explained that these claims mirror the previously discussed federal claim of trademark infringement by also requiring proof of a likelihood of confusion. *See, e.g., Homeowners Group*, 931 F.2d at 1105 (false designation of origin claim under 15 U.S.C. § 1125(a) requires proof of likelihood of confusion); *Mister Twister, Inc. v. JenEm Corp.*, 710 F.Supp. 202, 204 (S.D.Ohio 1989)(Ohio common-law trademark infringement and DTPA claims, like federal trademark infringement and false designation claims, require proof of likelihood of confusion); *see also Yocono's Restaurant, Inc. v. Yocono*, 100 Ohio App.3d 11, 651 N.E.2d 1347, 1350 (1994)(DTPA is substantially similar to 15 U.S.C. § 1125(a))(citing *Worthington Foods*, 732 F.Supp. at 1431). After find-

ing as a matter law that no likelihood of confusion exists for the purposes of the federal trademark infringement claim, the District Court accordingly granted summary judgment against the federal false designation claim and the state law claims as well. Because we instead have found that material issues of fact remain regarding the likelihood of confusion, we also reverse the grant of summary judgment to defendant on these claims and remand them to the District Court for further proceedings.

### V. Conclusion

Accordingly, we REVERSE the grant of summary judgment to defendant and REMAND for proceedings consistent with this opinion.