NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0363n.06
Filed: May 6, 2005

**Nos. 03-4458, 03-4542**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

STILSON & ASSOCIATES, INC.; DLZ )
OHIO, INC., )
                                      )
        Plaintiffs-Appellees, Cross-Appellants )
                                      )
v. )
                                      )
STILSON CONSULTING GROUP, LLC; ) ON APPEAL FROM THE UNITED
WILLIAM E. STILSON; JERRY R. DAILEY, ) STATES DISTRICT COURT FOR THE
                                      ) SOUTHERN DISTRICT OF OHIO
        Defendants-Appellants, Cross- )
        Appellees. )

Before: BOGGS, Chief Judge; COOK and BRIGHT, Circuit Judges.[*]

COOK, Circuit Judge. Defendants, Stilson Consulting Group, William Stilson, and Jerry Dailey, appeal the district court's judgment in favor of Plaintiffs, DLZ and Stilson & Associates, on various federal and state-law claims arising from Defendants' use of the "Stilson" name. Plaintiffs cross-appeal the district court's judgment in favor of Defendants on Plaintiffs' tortious-interference with-a-business-relationship claim. We affirm.

I

---

[*]The Honorable Myron H. Bright, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Alden Stilson founded Alden E. Stilson & Associates, a civil engineering firm, in the mid-1940s. In the late 1980s, the DLZ Corporation purchased the firm, by then known as Stilson & Associates, and made Dodson-Lindblom Associates its parent company. In 1995, DLZ merged Stilson & Associates into Dodson-Lindblom and changed the name to Dodson-Stilson. Then, in 2000, Dodson-Stilson and other DLZ Corporation firms in Ohio merged to form DLZ Ohio.

That same year, William E. Stilson, Alden Stilson's grandson, created and began operating Stilson Consulting Group in direct competition with DLZ Ohio. Plaintiffs sued, arguing that Defendants' use of the name Stilson, in combination with its use of an "S" insignia and corporate colors and inclusion of Stilson & Associate firm history in its brochure, violated the Lanham Act and constituted unfair competition, trade name infringement, a deceptive trade practice, and misappropriation or conversion of assets. According to Plaintiffs, customers would likely perceive Stilson Consulting Group as related to Stilson & Associates. Plaintiffs also claimed dilution of the Stilson name and tortious interference with a business relationship.

The standard applicable to Lanham Act claims governs Plaintiffs' unfair competition, common law trade name infringement, and claims under the Ohio Deceptive Trade Practices Act—thus, success depends on whether Plaintiffs demonstrate a likelihood of confusion. 15 U.S.C. § 1125; Ohio Rev. Code § 4165.02*; Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280, 288 (6th Cir. 1997); *NBBJ E. Ltd. P'ship v. The NBBJ Training Acad., Inc.*, 201 F. Supp.2d 800, 804 (S.D. Ohio 2001). Following a bench trial, the district court concluded that Plaintiffs had not abandoned the Stilson & Associates name, as Defendants claimed, and that

Defendants' conduct created a likelihood of confusion. Accordingly, the district court granted judgment in favor of Plaintiffs on their claims of trade name infringement, unfair competition, deceptive trade practices under the Lanham Act and Ohio Deceptive Trade Practices Act, and misappropriation or conversion of assets (which the district court construed as an unfair competition claim). The district court granted judgment in favor of Defendants on Plaintiffs' claims of dilution and tortious interference with a business relationship. In a separate order, the district court issued a permanent injunction.

Defendants now challenge the district court's abandonment and likelihood-of-confusion findings. Defendants further contest the scope of the court's injunction, which requires Defendants to alter Stilson Consulting Group's name. Plaintiffs cross-appeal the district court's tortious-interference judgment.

II

A. Abandonment

"[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark[1] is free to use the mark without liability to the plaintiff." *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002). Under § 1127 of the Lanham Act, "[a] mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not

---

[1]Under the Lanham Act, the term "mark" includes services marks, which are names (such as Stilson here) "used to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services . . . ." 15 U.S.C. § 1127.

to resume such use." "Use of a mark means the bona fide use of such mark in the ordinary course of trade, and not made merely to reserve a right in a mark." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 575 (6th Cir. 2000) (quoting 15 U.S.C. § 1127) (internal quotation marks omitted). Thus, "[i]n order for a party to succeed on a claim of abandonment, it must prove the elements of both non-use and intent, *i.e.*, that the other party actually abandoned its mark through non-use and that it intended to do so." *Id.* at 575-76 (citing *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 138 (3d Cir. 1981)). And "[b]ecause a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" *Cumulus Media, Inc.,* 304 F.3d at 1175 (footnote omitted).

Defendants contend that Plaintiffs abandoned the Stilson name following the 1995 merger. First, relying on a D.C. Circuit case, *Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp.*, 109 F.2d 35 (D.C. Cir. 1939), Defendants allege that the name's goodwill did not survive the merger and that we must, therefore, deem the name abandoned. Second, though Defendants recognize that Plaintiffs continued to use the Stilson name after the merger, they analogize such use to exhausting inventory of a discontinued line of goods and object to its characterization as "bona fide." *See Del-Rain Corp. v. Pelonis USA, Ltd.*, 29 Fed. Appx. 35, 38 (2d Cir. 2002) ("An effort to dispose of the remaining stock of an abandoned line of merchandise does not constitute a bona fide use . . . in the ordinary course of trade that suffices to defeat a finding of abandonment.") (internal quotation marks and citations omitted); *Uncas Mfg. Co. v. Clark & Coombs Co.*, 309 F.2d 818, 820 (1st Cir. 1962) (upholding the district court's finding that the plaintiffs abandoned a jewelry label, despite continued attempts to sell rings with the label, where such sale attempts "may well have been directed to

disposal of the remaining stock of an abandoned line of merchandise instead of an intention to continue the line"); *Anvil v. Consol. Foods Corp.*, 464 F. Supp. 474 (S.D.N.Y. 1978) (concluding the sale of remaining inventory—approximately 100,000 shirts—bearing a discontinued label did not constitute "bona fide" use where the plaintiff  "was merely depleting an inventory of labels it had on hand on items where the use of an obsolete label made no difference").

Plaintiffs dispute that the merger extinguished the goodwill of the Stilson & Associates name (and also question the continued viability of *Lawyers Title Ins. Co.* —a pre-Lanham Act case), and point the court to cases holding that a plaintiff's decreased use of a mark, even with the intent to ultimately phase out its use, does not constitute abandonment. *See Emachines, Inc. v. Ready Access Memory, Inc.*, No. 00-00374-VAP, 2001 U.S. Dist. Lexis 13904 at *26 (C.D. Cal. March 5, 2001) (emphasizing "[t]he Lanham Act does not require a regular pattern of sales to prove use" and concluding that using inventory, servicing existing customers, and making new sales of a discontinued product constituted bona fide use under the Lanham Act); *KeyCorp v. Key Bank & Trust*, 99 F. Supp. 2d 814, 827 (N.D. Ohio 2000) ("Without being able to establish non-use of [the mark by the plaintiff], [the defendant] certainly cannot establish that [the plaintiff] does not intend to resume use of the mark.  This is true even if the company did at one time have the goal of discontinuing [the mark].").

Regarding Plaintiffs' use of the Stilson name after the merger, the district court found: clients who approached Dodson-Stilson or, later, DLZ, believing them to be Stilson & Associates were not turned away or denied services; part of Plaintiffs' strategy was to use or invoke the Stilson

name if it facilitated interchange with the client; Stilson & Associates continued to perform work on contracts existing before the 1995 merger, including making ninety-two proposals; Plaintiffs continued to send Stilson & Associates documents to clients and to receive documents and payments directed to Stilson & Associates; and as of February 2002, Stilson & Associates had thirteen contracts for six clients.[2] Though finding the evidence in Plaintiffs' favor "not overwhelming," the district court concluded that Defendants failed to satisfy their burden of proving abandonment.

Because abandonment is a question of fact, we review the district court's finding for clear error. *See Cumulus Media, Inc*., 304 F.3d at 1174; *McCarthy on Trademarks* § 17.1. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse it even if convinced that we would have weighed the evidence differently sitting as the trier of fact. *Anderson*, 470 U.S. at 574. In the face of conflicting evidence and authority supporting both Plaintiffs' and Defendants' views, we cannot deem implausible the district court's conclusion that Plaintiffs used the Stilson & Associates name to identify the source of services—a bona fide use. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. Accordingly, we uphold the district court's rejection of Defendants' abandonment defense for the reasons provided in its thorough and well-reasoned opinion.

---

[2]Defendants attack the district court's factual findings to the extent that they rely on testimony from Plaintiffs' witnesses, given the "record of false testimony provided by Plaintiffs' employees." But nothing prohibits the district court from finding some aspects of Plaintiffs' evidence credible while rejecting others as incredible, and such assessments are virtually unchallengeable. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75 (1985). Defendants fail to justify upsetting the district court's findings here.

### B. Likelihood of Confusion

"The touchstone of liability under [the Lanham Act] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of goods offered by the parties." *Daddy's Junky Music Stores*, 109 F.3d at 280. When determining the likelihood of confusion, the Sixth Circuit applies the eight factors articulated in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc*.: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) the evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; (8) the likelihood of expansion of the product lines. 670 F.2d 642, 648 (6th Cir. 1982). In *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc*., this court further clarified:

> These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

931 F.2d 1100, 1107 (6th Cir. 1991).

The district court, after considering each of the *Frisch's* factors, concluded: "[P]laintiffs have carried their burden of proving that [D]efendants' use of the Stilson Consulting Group name and the 'S' insignia creates a likelihood of confusion." The court acknowledged that some factors weighed in favor of Defendants—the degree of purchaser care and the decline in the strength of the Stilson

- 7 -

& Associates name since 1995. But, according to the court, the relatedness of the services offered

by Plaintiffs and Defendants, as well as the similarity of the marks, tipped the scale in Plaintiffs'

favor. Though the district court agreed with Defendants that buyer sophistication would likely

prevent confusion at the point of sale, it found initial-interest confusion likely: "[A] consumer is

likely to be confused when first becoming aware of Stilson Consulting Group . . . given the

similarly in names and the fact that [Plaintiffs] and [Defendants] are direct competitors in the same

market."

We review the district court's underlying factual findings for clear error and its ultimate

finding of confusion de novo. *Homeowners*, 931 F.2d at 1107. Defendants first argue the district

court's initial-interest-confusion finding suffers from the court's purported failure to consider the

unique aspects of the engineering market and to give sufficient weight to the degree of consumer

care. In the alternative, Defendants maintain that, even assuming the likelihood of initial-interest

confusion, the district court erroneously concluded that such confusion violates the Lahnam Act. We

find these arguments unpersuasive.

Defendants insist that, in finding initial-interest confusion likely, the district court failed to

account for "aspects of the engineering services market that would make the possibility of confusion

very remote," such as the degree of consumer care and sophistication and the emphasis consumers

place on individual engineers and engineering teams. This failure, according to Defendants, caused

the court to place undue weight on the similarity-of-marks factor and to define the product too

broadly—as engineering services, instead of as "the skill, expertise, and experience of the

engineering teams that firms can provide." But the record reflects the district court recognized and carefully considered the unique characteristics of the engineering market, and we find no clear error in the court's factual findings regarding the *Frisch's* factors.

Defendants also cite *Rust Env't & Infrastructure, Inc., v. Teunissen*, 131 F.3d 1210 (7th Cir. 1997), as purported authority for the proposition that confusion is unlikely in the engineering market. In *Rust*, the Seventh Circuit found confusion unlikely, in part because of the sophistication of consumers of wastewater engineering consultants and the high cost of wastewater projects. Nothing in the *Rust* opinion convinces us to alter our view that a likelihood of confusion exists in this case. First, we have no basis for comparing the wastewater engineering market to the engineering market at issue here—and no reason to assume the two identical. Moreover, as indicated, confusion determinations must be made on a case-by-case basis, *Homeowners*, 931 F.2d at 1107, not on the basis of broad market generalizations. Finally, the presence of actual survey evidence suggesting the unlikelihood of confusion in *Rust* further distinguishes that case. Here, the district court acknowledged consumer sophistication, but found this factor could not negate the likelihood of confusion created by the similarity of the marks and the direct nature of the competition between the parties. We find no error in this analysis.

Likewise, Defendants' insistence that initial-interest confusion cannot sustain a likelihood-of-confusion finding lacks merit. Our precedent expressly repudiates the notion that the Lanham Act prohibits only point-of-sale confusion. In *Ferrari S.P.A. Esercizio Fabriche Automobili E. Corse v. Roberts*, 944 F.2d 1235 (6th Cir. 1991), the defendant claimed his use of Ferrari's

automobile design could not create a likelihood of confusion because he informed his purchasers that his cars were not Ferraris, eliminating any confusion at the point of sale. Concluding that the defendant's pre-sale disclosure did not insulate him from liability, the court reasoned: "The Lanham Act . . . was intended to do more than protect consumers at the point of sale." *Id*. at 1244; s*ee also Rust*, 131 F.3d at 1217 ("[I]nitial interest confusion is also forbidden by the Lanham Act. The Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods or services as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated.") (citations and internal marks omitted).

Defendants cite *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270 (3d Cir. 2001), for the proposition that initial-interest confusion only suffices under the Lanham Act if the court concludes that the initial confusion will have a meaningful effect in the marketplace. In *Checkpoint*, the Third Circuit, evaluating the import of evidence of actual initial-interest confusion, opined: "Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis." *Id*. at 297. But *Checkpoint* does little to strengthen Defendants' arguments here. The *Checkpoint* court expressly declined to "issue a blanket rule limiting the probative value of initial interest," concluding instead that "[i]ts significance will vary and must be determined on a case-by-case basis" after evaluating all of the relevant factors. *Id*. Central to the court's conclusion that evidence of initial-interest confusion lacked probative value in that case was the absence of party competition and interrelatedness. Here, by contrast, the district court expressly

found both. Thus, contrary to supporting the irrelevance of initial-interest confusion in this case, *Checkpoint* underscores its importance. Consequently, we find no error in the district court's conclusion that the likelihood of initial-interest confusion rendered Defendants liable under the Lanham Act.

In sum, we find no clear error in the district court's underlying factual findings, and we agree that those findings support a conclusion that Defendants' use of the Stilson name created a likelihood of confusion.

## C. Scope of Injunction

Finally, Defendants contend that the district court "erred as a matter of law when it restrained its own authority to fashion an injunctive remedy on the premise that the Lanham Act compels a name change." As support, Defendants point to the district court's statement that "[w]hile [D]efendants argue that any confusion can be dispelled by a remedy short of name change, the Lanham Act does not permit anything less."

We view the district court's statement not as an indication that the judge lacked knowledge of his discretion to fashion a remedy short of a name change, but as an expression that he deemed this an inappropriate case in which to exercise that discretion. The district court correctly posited: "If the name of a firm is likely to cause confusion in the marketplace, then the court has the obligation to eliminate such likelihood." The district court's analysis shows no misapprehension of the applicable law and convinces us that it considered the facts of this case and fashioned a

remedy no broader than necessary to eliminate the likelihood of confusion. In short, we find no abuse of discretion in the injunctive relief granted.

### D. Cross Appeal—Tortious Interference with a Business Relationship

Plaintiffs also claim that Defendants tortiously interfered with their business relationship with the City of Pickerington when the City ended its relationship with Plaintiffs and followed Jerry Dailey to Defendants' firm. Under Ohio law, "[t]he elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Wolf v. McCullough-Hyde Mem. Hosp., Inc.*, 586 N.E.2d 1204, 1208 (Ohio Ct. App. 1990) (citations omitted). In rejecting Plaintiffs' claim, the district court considered evidence that the City, dissatisfied with Plaintiffs' work, would have gone elsewhere for its future projects, regardless of Defendants. This evidence, combined with the lack of evidence that Defendants solicited the City's breach of its agreements with Plaintiffs or otherwise acted improperly, convinced the court that Plaintiffs could not sustain its tortious-interference claim. We agree with the district court that Defendants cannot be said to have *caused* the termination of the relationship. Plaintiffs argue that Defendants' willingness to contract with the City—which allegedly enabled the City to end its relationship with Plaintiffs—suffices to render them liable. Plaintiffs, however, provide no authority for this contention, and we find it unpersuasive. The district court, therefore, correctly entered judgment in favor of Defendants on this claim.

III

Accordingly, we affirm the decision of the district court in all respects for the reasons stated in this opinion and in the well-reasoned opinion of the district court.