**KEYCORP, Plaintiff,**

v.

**KEY BANK & TRUST, Defendant.**

No. 1:97 CV 1419.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 23, 2000.

Thomas F. Zych, Sr., Robert Francis Ware, Jr., Kristin M. Ehlers, of Thompson, Hine & Flory, Cleveland, OH, for Plaintiff and Counter–Defendant.

Janet F. Satterthwaiteof Venable, Baetjer, Howard & Civiletti, Washington, DC, E. John Brzytwa, Jr., Jonathan R. Cooper, Daniel Francis Petticord, of Martindale, Bryztwa & Quick, Cleveland, OH, for Defendant and Counter–Claimant.

## ORDER

OLIVER, District Judge.

Plaintiff, KeyCorp ("KeyCorp"), in its Amended Complaint against Defendant, Key Bank & Trust ("KBT"), asserts federal claims of false designation of origin and service mark infringement, and state law claims of service mark infringement, deceptive trade practices, trade name infringement and unfair competition. KBT filed a counterclaim alleging similar federal and state law claims against KeyCorp as well as a petition to cancel KeyCorp's trademarks at issue. The dispute between the parties arises from KeyCorp's use of the marks KEY BANK and KEY ADVANTAGE in connection with certain of its banking services, and KBT's use of the marks KEY BANK & TRUST and KEY ADVANTAGE with similar services.[1]

Now pending before the court are: (1) KeyCorp's Motion for Summary Judgment as to Counts I, III, V and VI of KBT's Counterclaims (Doc. No. 50); (2) KBT's Motion for Partial Summary Judgment (Doc. No. 55); (3) KeyCorp's Motion for Summary Judgment as to KBT's Affirma-

---

**1.** Except where otherwise indicated, this court's use of KEY BANK in relation to Key-Corp includes by reference KeyCorp's use of the mark KEYBANK.

tive Defense of Registration No. 1,722,378 (Doc. No. 52); (4) KeyCorp's Motion for Summary Judgment as to Counts II, IV and VI of KBT's Counterclaims (Doc. No. 53); (5) KBT's Motion to Strike Portions of the Declarations of Alison Potts and Pamela Goding (Doc. No. 91); and (6) KBT's Motion to Strike a Portion of Key-Corp's Reply Memorandum in Support of KeyCorp's Motion for Summary Judgment on Counts II, IV and VI of KBT's Counterclaims (Doc. No. 100). For the reasons discussed below: (1) KeyCorp's Motion for Summary Judgment as to Counts I, III, V and VI of KBT's Counterclaims is granted insofar as these counterclaims relate to KeyCorp's use of the mark KEY BANK but denied insofar as they relate to Key-Corp's use of the mark KEY ADVANTAGE; (2) KBT's Motion for Partial Summary Judgment is denied; (3) KeyCorp's Motion for Summary Judgment as to KBT's Affirmative Defense of Registration No. 1,722,378 is granted; (4) KeyCorp's Motion for Summary Judgment as to Counts II, IV and VI of KBT's Counterclaims is denied; (5) KBT's Motion to Strike Portions of the Declarations of Alison Pots and Pamela Goding is denied; and (6) KBT's Motion to Strike a Portion of KeyCorp's Reply Memorandum in Support of KeyCorp's Motion for Summary Judgment is denied.

## I. FACTS

### A. *KeyCorp*

KeyCorp, an Ohio corporation, is a full-service bank holding-company. Since 1967, KeyCorp has offered a range of banking, financial and related services in connection with its KEY BANK name and mark. In 1978, KeyCorp alleges that it expanded its use of the KEY BANK name to identify its banking-related holdings. At that time, the bank's 1967 logo was updated by rotating the word "Key" at a 90 degree angle to the word "Bank" and enclosing a stylized key design (the "L-shaped mark"). KeyCorp maintains that it then used the L-shaped mark in conjunc-

tion with nearly every KeyCorp service. KeyCorp obtained federal registration of the L-shaped mark in October of 1992 (registration number 1,722,378). The Certificate of Registration for the L-shaped mark indicates the date of first use of this mark as January 1, 1980.

In 1995, KeyCorp adopted a mark consisting of the key-shaped logo with the words KEYBANK below. KeyCorp obtained federal registration of the second KEYBANK design mark in December of 1996 (registration number 2,025,726). It maintains that the 1996 mark is used on a majority of KeyCorp's banking products, but that the L-shaped mark is still used by many of its KeyBank branches in various areas of the country.

KeyCorp also adopted use of the mark KEY ADVANTAGE in connection with its financial and banking services and alleges that its use of the mark began at least as early as January of 1993. In December of 1996, KeyCorp obtained federal registration of the KEY ADVANTAGE mark (Registration Number 2,021,079).

### B. *KBT*

KBT was established in 1961 as KEY FEDERAL SAVINGS & LOAN ASSOCIATION. In 1986, KBT changed its name to KEY FEDERAL SAVINGS BANK in order to avoid being associated with Maryland's savings and loan crisis of the previous year. In October of 1996, KBT converted from a federally-chartered thrift institution to a state-chartered commercial bank. At that time, KBT changed its name from KEY FEDERAL SAVINGS BANK to KEY BANK & TRUST. KBT, currently a Maryland corporation, asserts that its name and mark is well-known in the mid-Atlantic region, including such areas as Maryland, Virginia, Delaware and the District of Columbia.

KBT claims that in 1981, it began using the phrase KEY ADVANTAGE to identify the way in which it provided its services.

KBT does not allege that any distinct products or services were offered under the name KEY ADVANTAGE. Shortly after KeyCorp initiated the present suit against KBT, KBT recalled the materials it was using which contained the mark KEY ADVANTAGE. KBT maintains that it intends to resume use of the KEY ADVANTAGE mark if it is successful in the present suit.

## C. *The Claims and Counterclaims*

KeyCorp's Amended Complaint contains the following nine counts:

Count I: False Designation of Origin
KeyCorp claims that KBT's use of the name and mark KEY BANK & TRUST is likely to cause confusion with KeyCorp's KEY BANK name and marks, defined as three federally registered marks: (a) KEY BANK and Design, Reg. No. 1,722,378 (the L-shaped mark); (b) KEYBANK and Design, Reg. No. 2,025,726 (the 1996 mark); and (c) KEYBANK USA and Design, Reg. No. 2,175,115;

Count II: Federal Service Mark Infringement
KeyCorp claims that KBT's use of the mark KEY ADVANTAGE infringes KeyCorp's rights to the KEY ADVANTAGE mark;

Count III: False Designation of Origin
KeyCorp claims that KBT's use of the mark KEY ADVANTAGE is likely to cause confusion with KeyCorp's KEY ADVANTAGE mark;

Count IV: Common Law Service Mark Infringement
KeyCorp claims that KBT's use of the mark KEY BANK & TRUST infringes KeyCorp's common law rights in its KEY BANK marks;

Count V: Common Law Service Mark Infringement
KeyCorp claims that KBT's use of the mark KEY ADVANTAGE infringes KeyCorp's common law rights in its KEY ADVANTAGE mark;

Count VI: Violation of Ohio Deceptive Trade Practices Act
KeyCorp claims that KBT's adoption and use of KEY BANK & TRUST as a name or mark is a deceptive trade practice in that it is likely to cause confusion as to KBT's affiliation, connection or association with, or certification by, KeyCorp;

Count VII: Violation of Ohio Deceptive Trade Practices Act
KeyCorp claims that KBT's adoption and use of KEY ADVANTAGE is a deceptive trade practice in that it is likely to cause confusion with KeyCorp's KEY ADVANTAGE mark;

Count VIII: Trade Name Infringement
KeyCorp claims that KBT's use of the name KEY BANK & TRUST infringes KeyCorp's rights in the trade name KEY BANK; and

Count IX: Unfair Competition
KeyCorp claims that KBT has engaged in unfair competition by using the name and mark KEY BANK & TRUST and the mark KEY ADVANTAGE in that KBT has traded on KeyCorp's valuable reputation and goodwill in its name and marks and has caused a likelihood of confusion among consumers.

KBT's counterclaim contains the following six counts:

Count I: False Designation of Origin
KBT claims that KeyCorp's use of the name and mark KEY BANK is likely to cause confusion with KBT's KEY name and mark;

Count II: False Designation of Origin
KBT claims that KeyCorp's use of the mark KEY ADVANTAGE is likely to cause confusion with KBT's KEY ADVANTAGE mark;

Count III: Common Law Service Mark Infringement
KBT claims that KeyCorp's use of the mark KEY BANK infringes KBT's common law rights in its KEY mark;

Count IV: Common Law Service Mark Infringement
KBT claims that KeyCorp's use of the mark KEY ADVANTAGE infringes KBT's common law rights in its KEY ADVANTAGE mark;

Count V: Common Law Unfair Competition
KBT claims that KeyCorp has engaged in unfair competition by using the name and mark KEY BANK & TRUST and the mark KEY ADVANTAGE in that KeyCorp has traded on KBT's valuable reputation and goodwill in its name and marks and has caused a likelihood of confusion among consumers; and

Count VI: Petition to Cancel Trademark
KBT claims that KeyCorp applied for federal registration of the marks KEY BANK and Design, KEYBANK and Design and KEY ADVANTAGE with full knowledge of KBT's prior use of the KEY mark in connection with similar services; that KeyCorp misled the Trademark Office in filing the applications, and that KeyCorp is attempting to misuse its registrations to expand into the geographic area of KBT.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The Court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or a otherwise provided in this rule, must set forth specific facts show-

ing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, the court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–944 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,*

477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–1480 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**B. Law and Analysis**

**1. The Cross Motions for Summary Judgment as to Counts I, III, V and VI of KBT's Counterclaims**

KeyCorp moves for summary judgment on counterclaims I, III, V, and VI on the ground that it has superior rights to the KEY BANK name and mark.[2] KeyCorp alleges that whereas it began using KEY BANK in 1967, any rights KBT may have to the name and mark came about thirty years later, in 1996, when KBT changed its name to KEY BANK & TRUST. As KBT's counterclaims are based on the premise that it is KBT who is the senior user of the KEY BANK mark, KeyCorp asserts that KBT's counterclaims are not cognizable.[3] KBT rests its motion for summary judgment as to these counterclaims on the argument that the priority of the use of KEY, not KEY BANK, controls

**2.** Neither KeyCorp nor KBT move for summary judgment on Counts V or VI of KBT's counterclaims insofar as they relate to the mark KEY ADVANTAGE. Accordingly, those portions of these two counts which relate to KEY ADVANTAGE survive.

**3.** The issue of priority is central to the determination of the parties' cross-motions for summary judgment on KBT's counterclaims relating to KEY BANK because, in order to

prevail on infringement, false designation of origin, and unfair competition claims, a party must show (1) that it had prior rights to its mark or name, and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two. If KBT cannot meet the first element, it cannot prevail on any of its counterclaims relating to KEY BANK.

this dispute. It asserts that it can "tack" the use of the word KEY in its name to 1961 and that therefore, it is KeyCorp who is infringing KBT's rights in such name and mark. For the reasons discussed below, the court finds that KeyCorp is the senior user of the KEY BANK mark and that it is entitled to summary judgment on Counts I, III, V and VI of KBT's counterclaims.

### a. *Tacking*

The concept of a trademark undergoing minor changes but maintaining the same overall commercial impression is called "tacking." *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620 (6th Cir.1998). In the Sixth Circuit, the test for tacking is rigorous: "the use of an earlier mark can be tacked onto the use of a subsequent mark only if the previously used mark is 'the legal equivalent of the mark in question or indistinguishable therefrom' such that consumers 'consider both as the same mark.'" *Id.* at 623 (quoting *Van Dyne–Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir.1991)). The requisite degree of similarity between the new and old formats is greater than the test for likelihood of confusion (*i.e.*, that two marks are "confusingly similar"). *Van Dyne–Crotty*, 926 F.2d at 1159. Rather, the marks sought to be tacked must create the same continuing commercial impression. *Data Concepts*, 150 F.3d at 623. Courts are to view marks in their entirety to determine whether they convey the same commercial impression. *Van Dyne–Crotty*, 926 F.2d at 1160. It is not often that two marks are found to be legal equivalents, and the Sixth Circuit has cautioned that tacking should only be permitted in "rare circumstances." *Data Concepts*, 150 F.3d at 623. Finally, the determination of whether a mark creates the same continuing commercial impression is a question of law. *Id.*

In *Van Dyne–Crotty*, 926 F.2d at 1160, for example, the Federal Circuit concluded that priority in CLOTHES THAT WORK FOR THE WORK YOU DO could not be tacked onto CLOTHES THAT WORK because "purchasers would clearly differentiate them." Similarly, the Sixth Circuit held that use of the mark DCI in its Internet address DCI.COM was not the legal equivalent of the company's prior use of a stylized trademark "dci" because the two marks did not look alike. *Data Concepts*, 150 F.3d at 624 (affirming district court's grant of summary judgment with respect to the issue of priority). In fact, the court cited *Van Dyne–Crotty* as a case in which the court had rejected an effort to tack the use of two marks that were much more similar than those at issue in *Data Concepts*. *Id. See also, Brookfield Comm., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1049 (9th Cir.1999) (holding that MOVIE BUFF'S MOVIE STORE and MOVIEBUFF.COM could not be tacked because "the latter contains three fewer words, drops the possessive, omits a space, and adds '.COM' to the end").

KBT argues that it can tack use of its KEY BANK & TRUST name onto its prior use of KEY FEDERAL SAVINGS BANK and KEY FEDERAL SAVINGS AND LOAN ASSOCIATION to gain a first-use date of 1961. It argues that the issue in this case is the first use of the term KEY, as opposed to KEY BANK. As support, it contends that the remaining words in each of its three titles are simply generic "noise words" and that, in the area of banking services, they do not make an impression on consumers apart from the word KEY.

On the other hand, KeyCorp maintains that use of KEY BANK is central to determining the matter of priority. It asserts that under the strict tacking standards applied by the Sixth Circuit, KBT should not be permitted to tack use of its three names. KeyCorp argues that KBT changed its name in 1986 and 1996 for the very purpose of changing the commercial impression created by its name. Specifically, in 1986, KBT changed its name because it did not wish to be associated with

the recent savings and loan scandal. Further, KeyCorp argues that the name KEY FEDERAL SAVINGS BANK and KEY BANK & TRUST are not legal equivalents because the former was used to signify a federally chartered bank and the latter is used to signify a state chartered bank.

The court finds that KBT's marks, as a matter of law, do not create a continuing commercial impression such that they can be tacked on to each other to achieve a first-use date of 1961. First, visually and aurally, the three marks KBT seeks to tack, KEY FEDERAL SAVINGS & LOAN ASSOCIATION, KEY FEDERAL SAVINGS BANK, and KEY BANK & TRUST, are substantially different. The only similarity between KBT's current name and its first name is the word KEY. However, such similarity is insufficient given that courts may not split marks into their component parts in determining whether they may be tacked, but rather must evaluate the impression which the mark as a whole creates. *See e.g., Lone Star Steakhouse & Saloon v. Longhorn Steaks*, 106 F.3d 355, *modified by* 122 F.3d 1379 (11th Cir.1997) (rejecting the plaintiff's argument that LONE STAR CAFÉ could be tacked on to LONE STAR STEAKHOUSE because both used the dominant term LONE STAR). Likewise, KBT's current name and its second name are not sufficiently similar to be considered legal equivalents. KEY BANK & TRUST rearranges two of the terms in KEY FEDERAL SAVINGS BANK, drops two of the terms in the former name, and adds two new terms. Courts, including the Sixth Circuit in *Data Concepts*, have rejected efforts to tack marks that are much more similar.

Additionally, the circumstances under which KBT's names were changed clearly demonstrate that each of its names does not create the same continuing commercial impression. When KBT decided to change its name in 1986 from KEY FEDERAL SAVINGS & LOAN ASSOCIATION to KEY FEDERAL SAVINGS BANK, it ad-

mittedly did so in order to dissociate itself from the recent savings and loan scandal. Given the climate of the 1980's with regard to S & L's, and the fact that the average consumer's awareness of the distinctions between S & L's and banks was heightened in light of the scandal, it is likely that KBT would have been successful in doing so. In 1986, the average consumer would not have seen the mark KEY FEDERAL SAVINGS & LOAN ASSOCIATION as "indistinguishable" from, or "the same mark" as, KEY FEDERAL SAVINGS BANK. *See Data Concepts*, 150 F.3d at 623. Indeed, KBT's claim that its name changes were not noticeable to customers is somewhat disingenuous given that at least its first name change was made in the *hope* that its customers would distinguish its former name from its new one.

The change from KEY FEDERAL SAVINGS BANK to KEY BANK AND TRUST also constitutes a break in the commercial impression created by each name. Indeed, the two marks are used to signify two entirely different legal entities. KBT did not begin using KEY BANK & TRUST until it converted from a federally-chartered savings bank to a state-chartered commercial bank. KBT's former name clearly identified that the bank was federally chartered. Its current name certainly cannot be said to convey this same information to consumers, even though it does not specifically identify that the bank is now state chartered. The instant case is analogous to the situation in *Sterling Bank v. Sterling Bank and Trust Co.*, 928 F.Supp. 1014, 1996 WL 339849, (C.D.Cal. May 14, 1996), *vacated pursuant to settlement*, 1996 WL 500946 (C.D.Cal. July 5, 1996), in which the court held that the defendant Sterling Bank & Trust could not tack on its prior use of the names STERLING SAVINGS AND LOAN ASSOCIATION and STERLING SAVINGS BANK. The court found that STERLING BANK AND TRUST imparted more information to consumers than the previous marks and, hence, was legally different because it indi-

cated the type of financial institution and the services it offered. Likewise, KEY FEDERAL SAVINGS BANK imparts different and, arguably, more information than does KBT's present mark KEY BANK & TRUST.[4] Consequently, KBT cannot tack its use of KEY BANK & TRUST to KEY FEDERAL SAVINGS BANK.

Because KBT's three names cannot be tacked, it must be said that any rights KBT may have in the KEY BANK mark were created in 1996. The record clearly shows, and KBT admits, that KeyCorp was operating under the KEY BANK mark prior to 1996. In fact, KeyCorp had nationwide constructive use of the mark as of the date it filed its application for federal registration of the L-shaped mark. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.37 (4th ed. 1997) ("*McCarthy on Trademarks*"). Thus, the court finds KeyCorp to be the senior user of the KEY BANK mark.

#### b. *The Rights of a Junior User*

KBT claims that even if the term KEY BANK, and not KEY, controls this case, it still has priority in several states for use of KEY BANK. As support, KBT claims that beginning in October of 1996, it began using the KEY BANK & TRUST name and mark nationally in connection with its non-secured credit card services. In 1996, it also began using the new name in connection with its branch banking services located in Maryland, Delaware and Virginia. It maintains that by 1996, KeyCorp was marketing secured credit cards only within certain states: Alaska, Colorado, Idaho, Maine, Michigan, New Hampshire, New York, Ohio, Oregon, Utah, Vermont, Washington state, Florida, Illinois, Kentucky, Pennsylvania and Massachusetts. On this basis, KBT asserts that it is the senior user of the KEY BANK name and mark for non-secured credit card services

in those states where KeyCorp was marketing its secured credit card services in 1996, and is the senior user for all credit services in the remaining states. For its part, KeyCorp claims that it has had a nationwide presence since at least 1984 through, among other things, marketing of its mail-order banking services under the name and mark KEYBANK USA.

■ Courts have established that regional trademark rights may be allocated in certain instances to a junior user of a mark under the "good faith prior user" defense. This doctrine gives a good faith junior user "priority" rights against a senior user if the senior user attempts to enter a remote area where the junior user has built up trademark rights in good faith. The good faith prior user defense is only available if the following three elements are satisfied:

> (1) the junior user ... has adopted its mark before the senior user's ... registration under the Lanham Act, and without knowledge of the senior user's prior use; (2) the trade area in which the junior user used the mark prior to the senior user's registration was limited in extent; and (3) the junior user has continuously used the mark in the preregistration trade area.

*Allard Enter., Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 360 (6th Cir.1998) (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1124 (6th Cir.1996)). Because KeyCorp registered its first KEY BANK design and mark in 1992 and KBT did not begin using the name and mark KEY BANK & TRUST until 1996, KBT does not meet any of the elements of this defense. Consequently, KBT is not a "good faith prior user" and cannot enjoin use of KEY BANK by KeyCorp in any

---

4. This is true even in light of KBT's argument that it has continued to offer the same ser-    vices throughout its existence.

state or region.[5] Accordingly, the court grants KeyCorp's Motion for Summary Judgment as to Counts I, III, IV and VI of KBT's Counterclaims and denies KBT's Motion for Partial Summary Judgment with respect to these counterclaims.[6]

## 2. The Remaining Portions of KBT's Motion for Partial Summary Judgment

■ KBT has also moved for summary judgment on counts I, IV, VI, VIII and IX of KeyCorp's Amended Complaint on the ground that there is no likelihood of confusion between KBT's use of KEY BANK & TRUST and KeyCorp's use of KEY BANK. Because the court has already determined that KeyCorp is the senior user of the KEY BANK mark, all that remains to be determined is whether there is, in fact, a likelihood of confusion between the parties' marks. For the reasons set forth below, this court concludes that there is an issue of fact as to whether KBT's use of the name and mark KEY BANK & TRUST is likely to cause confusion among consumers as to the source of KBT's services or with respect to KeyCorp's affiliation therewith.

Common law trademark infringement, trade name infringement, violations of the Ohio Deceptive Trade Practices Act, and unfair competition and federal false designation of origin claims all employ a "likelihood of confusion" analysis as the basic test to determine liability. *See e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center* 109 F.3d 275, 288 (6th Cir.1997). The Sixth Circuit uses eight factors to determine whether there is a likelihood of confusion among consumers:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.1982) (quoting *Toho Co., Ltd. v. Sears, Roebuck & Co.,* 645 F.2d 788 (9th Cir.1981)). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931

---

**5.** In some circuits, the fact that KBT cannot enjoin use of KEY BANK by KeyCorp in any state does not necessarily mean that KeyCorp has the ability to enjoin KBT from using the mark in any state. In these circuits, even though a senior federal registrant has superior priority, courts will not enjoin use of a mark by a junior user unless and until the senior user shows a likelihood of entry into the junior user's trade territory. This rule developed from the landmark case *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir.1959), in which the Second Circuit found that without a likelihood of entry by the senior user, there would be no likelihood of confusion to enjoin. However, the Sixth Circuit has rejected the *Dawn Donut* rule, relying instead on its eight point test for likelihood of confusion. *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir.1999). According to the *Circuit City* court, "a court need only find that a defendant is liable for infringement or unfair com-

petition for it to award injunctive relief. The Sixth Circuit has an eight point test for infringement liability under the Lanham Act.... Likelihood of entry is just one of the eight factors under this test, and it is not dispositive of liability." *Id.*

As will be discussed below, genuine issues of material fact remain with respect to whether KBT's use of the name and mark KEY BANK & TRUST is likely to cause confusion among consumers with KeyCorp's KEY BANK name and marks. However, if KBT's use of KEY BANK & TRUST is ultimately found to be likely to cause confusion, then KeyCorp is entitled to nationwide injunctive relief against KBT, regardless of where KeyCorp markets its services.

**6.** Because the court finds that KeyCorp is the senior user of the KEY BANK name and mark, it need not address KeyCorp's alternative argument that Counts I, III, V and VI of KBT's Counterclaims are barred by laches.

F.2d 1100, 1107 (6th Cir.1991). In a case where likelihood of confusion is the dispositive issue, summary judgment is inappropriate if there are material factual disputes concerning the eight factors. *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir.1998).

### a. Strength of KeyCorp's Mark

In order to determine which party this factor favors, courts assign marks to four categories of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116–7 (6th Cir.1996). The categories constitute a spectrum of strength from weakest to strongest. *Daddy's Junky Music Stores*, 109 F.3d at 280. A generic term is commonly used to describe the relevant service, and "cannot become a trademark under any circumstances." *Id.* at 1117 (citations omitted) (listing "aspirin" and "light beer" as examples). Descriptive terms "specifically describe[ ] a characteristic or ingredient of an article." *Id.* (citations omitted) (citing BEST, SUPERIOR and PREFERRED as examples). A suggestive term "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* (citations omitted) (citing CITIBANK, which connotes an urban or modern bank, or GOLIATH, for large wood pencils, as examples). Finally, an arbitrary mark is one which "has 'a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached. . . .'" *Id.* (citations omitted) (citing CAMEL cigarettes and APPLE computers as examples).

Neither party sets forth which category it believes KEY BANK falls within. However, KBT alleges that KeyCorp's mark is weak because KEY is "dilute" in the field of banking and financial services. As evidence, it submits the declaration by Stephen C. Anderson that "[t]here were 158 active [federal] references containing KEY or words commencing with KEY with goods or services descriptions including 'bank' or 'financial.' Of those 158, 91 are not owned by KeyCorp." KBT's Mot. for Partial Sum. J., Ex. AA. KeyCorp counters by arguing that "'merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens in the marketplace.'" KeyCorp's Mem. Opp. KBT's Mot. Partial Sum. J. at 15 (quoting *Homeowners Group*, 931 F.2d at 1108). KeyCorp claims that because it has used the KEY BANK name and mark continually since 1967, and nationwide since at least 1984, this factor weighs in its favor.

The court finds that KEY BANK is at least a suggestive mark and is arguably an arbitrary or fanciful mark: the term KEY, although a word with a recognized meaning in everyday speech, does not have any inherent connection with banking services. *See Daddy's Junky Music Stores*, 109 F.3d at 280 (finding "Daddy's Junky Music Store" to be an arbitrary mark). Thus, it should be considered a relatively strong mark. However, because KBT has not entered into the record the third party marks it refers to in its brief, the court cannot evaluate the extent to which these marks affect the strength of KeyCorp's KEY BANK mark. Specifically, the court cannot evaluate whether such marks are different in ways that make them distinctive from KeyCorp's mark, or even whether they are still valid and in active use. *Id.* Thus, it remains a genuine issue of material fact whether the existence of these third party marks has weakened the KEY BANK mark for the purpose of banking services. In other words, at best, this factor favors neither party; it certainly does not favor KBT.

### b. Relatedness of the Goods

KBT asserts that the parties' services are distinguishable because KBT markets

secured credit card services while Key-Corp markets unsecured credit card services. According to the Sixth Circuit, there are three general categories regarding the relatedness of the goods and services of two parties. "First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." *Daddy's Junky Music Stores*, 109 F.3d at 282. The services offered by KBT and KeyCorp fit within the second category. While it is true that the services of the parties are similar in such a way that "they are likely to be connected in the minds of a prospective purchaser"—consumers are likely to see both as offering a full range of banking and financial services—it is also true that the parties do not compete directly in any state or region. Because the services of the two parties are merely somewhat related, this factor does not weigh in favor of either KBT or KeyCorp.

### c. *Similarity of the Marks*

KBT argues that the marks used by the two parties are not confusingly similar for two reasons. First, it argues that adding "AND TRUST" renders the two marks different based on the fact that KEY is a dilute mark in the banking and financial industry. Second, it argues that the actual presentation of the marks is different in that KeyCorp emphasizes the red key symbol with its word mark and the parties use a different font and color.

KeyCorp responds by arguing that KBT has erroneously performed a side-by-side comparison of the parties' marks. *Homeowners Group*, 931 F.2d at 1106. It cites to *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir.1988), which holds that side-by-side comparisons of two marks are insufficient because they do not account for the possibility that sufficiently similar marks "may confuse consumers who do not

have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." KeyCorp also argues that marks must be viewed in their entirety and that courts cannot focus on individual features. *Daddy's Junky Music Stores*, 109 F.3d at 283. According to KeyCorp, "[u]nder this standard, KBT's 'Key Bank and Trust' name is remarkably similar to KeyCorp's 'KeyBank' name." KeyCorp's Memo. Opp. KBT's Mot. for Partial Sum. J. at 16.

The court agrees that KeyCorp has cited the correct standard to be applied in analyzing the similarity of two marks; however, it finds that the actual degree of similarity between KEY BANK and KEY BANK & TRUST remains a genuine issue of material fact. *See Daddy's Junky Music Stores*, 109 F.3d at 284 (holding the district court had erred in granting summary judgment in part because there was a genuine issue of fact regarding the degree of similarity between DADDY's and BIG DADDY'S FAMILY MUSIC STORE).

### d. *Evidence of Actual Confusion*

In its Motion for Partial Summary Judgment, KBT assumed KeyCorp would submit evidence of telephone calls intended for KBT but misdirected to KeyCorp by "800" Directory Assistance operators as evidence of actual confusion and focused its analysis of this factor on such evidence. It claims that evidence of misdirected calls is not suitable as evidence of actual confusion because "[i]t is not evidence that the caller is confused as to the source of services, only that the operator has made a mistake in providing a number." KBT's Mot. for Partial Sum. J. at 23. It also maintains that KeyCorp's evidence of actual confusion is suspect because it is "from a limited period of time relative to the thirty-plus years spanned by the facts in this case" and because it begins two years after KBT adopted the name and mark KEY BANK & TRUST. *Id.* at 24.

In response, KeyCorp claims that it has received over 1,000 reports of incidents of actual confusion among consumers related to the parties' use of the marks KEY BANK and KEY BANK & TRUST. It submitted affidavits of six individuals who have confused KBT's KEY BANK & TRUST name with KeyCorp's KEY BANK name and mark. KeyCorp further submitted the deposition testimony of David Wells, President and Chief Operating Officer of KBT, who acknowledged that KBT had experienced consumer confusion involving the Internet between the two marks after KBT converted to KEY BANK & TRUST, but had not experienced such confusion prior to the conversion. However, it did not submit any evidence of calls misdirected by "800" operators.

Because KeyCorp did not submit evidence of calls misdirected by "800" operators, the court will not discuss the merits of KBT's argument with respect to such calls. Additionally, KBT's argument that KeyCorp's actual confusion evidence is suspect since it covers only the last few years and since it does not begin until after the initiation of KeyCorp's lawsuit, is not persuasive. First, it is not surprising that KeyCorp's evidence begins only recently given that KBT did not change its name to KEY BANK & TRUST until 1996. Indeed, such fact seems, if anything, to weigh in favor of KeyCorp. The fact that KeyCorp did not begin accumulating actual confusion evidence until after it initiated its lawsuit against KBT also does not taint KeyCorp's evidence sufficiently to discount it entirely.

In sum, given that KeyCorp has submitted evidence of actual confusion of at least six consumers, this factor favors KeyCorp at least to some extent. However, the court concludes that, at this time, there remains a genuine issue of material fact as to whether KeyCorp has submitted sufficient evidence of actual consumer confusion to sustain its claim for damages.

### e. Marketing Channels Used

The fifth factor "requires a court to consider the similarities or differences between the predominant customers of the parties' goods or services [and] ... whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores,* 109 F.3d at 285. KBT asserts that this factor weighs in its favor because "secured credit card services attract customers with low incomes who need to establish creditworthiness while unsecured credit card services attract customers with good incomes and established creditworthiness." KBT's Mot. for Partial Sum. J. at 24. As further support, KBT maintains that KeyCorp advertised in *Fortune* magazine while KBT advertised in *Soldier of Fortune* magazine. KeyCorp responds by arguing that both institutions have telemarketed their services and that both offer branch banking outlets. Further, it notes that KBT did not submit any evidence of the demographics of the readership of either *Fortune* or *Soldier of Fortune* magazines.

There remains a genuine issue of material fact as to whether this factor favors KBT or KeyCorp. While it does appear that the two parties wish to attract different types of consumers for their credit card services, it is also true that both parties offer their services through branch banking. Moreover, there is insufficient evidence in the record to determine the extent to which the methods of marketing employed by the two parties overlap, if at all.

### f. Likely Degree of Purchaser Care

Courts generally assess the likely degree of purchaser care by assessing the degree of care a typical buyer would exercise in purchasing the type of services at issue. *Homeowners Group,* 931 F.2d at 1111. However, in determining this factor, the sophistication of potential consumers with respect to the purchases of services at issue may be taken into account. *Id.* KBT asserts that this factor weighs in its favor because the degree of purchaser care is

high when consumer's money is at stake. On the other hand, KeyCorp argues that this factor weighs in favor of finding a likelihood of confusion because KBT's customers are less sophisticated than average customers. Both parties are correct in their assertions; accordingly, the court concludes that this factor weighs in favor of neither party.

### g. *Defendant's Intent in Selecting the Mark*

KBT claims that it acted in good faith in adopting its mark because it did so based on advice of counsel. KeyCorp argues that KBT did not adopt its KEY BANK & TRUST name in good faith because KBT "had a copy of KeyCorp's KeyBank mark that it compared with possible logos to be used by KBT after its conversion." KeyCorp's Mem. Opp. KBT's Mot. Partial Sum. J. at 19. According to KeyCorp, the fact that KBT consulted an attorney does not alter this conclusion.

That a party seeks advice of counsel "does not disprove that he hoped to trade on the goodwill and reputation of [another mark]. It merely indicates that he wanted to do so while staying within the bounds of the law. Intent in selecting the mark is a factor more likely to favor the owner of an infringing mark who was unaware of the prior similar mark." *Marketing Displays, Inc. v. Traffix Devices, Inc.,* 200 F.3d 929, 935 (6th Cir.1999). The court concludes there is insufficient evidence in the record to determine which party this factor favors.

### h. *Likelihood of Expansion of the Product Lines*

KBT claims that this factor weighs in its favor for several reasons. First, KeyCorp has elected not to offer secured credit card services under its own mark. Second, KeyCorp has sold to another bank a significant portion of its unsecured credit card services, and it no longer offers secured credit cards in a number of states. Finally, KBT alleges that KeyCorp has no plans to enter the branch banking market in the mid-Atlantic region. KeyCorp argues that this factor favors neither party because both already offer related services nationwide.

"A finding that the parties will not expand their markets significantly ... 'does not address' the ultimate likelihood of confusion .... Thus, ... an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is not a strong indication to the contrary." *Daddy's Junky Music Stores,* 109 F.3d at 287 (quoting *Champions Golf Club,* 78 F.3d at 1122). Accordingly, even if KBT were correct in its assertion that KeyCorp is not planning to enter the mid-Atlantic region or extend its credit card services beyond those states in which such services are currently offered, these facts would not necessarily weigh in its favor.

Based on the foregoing, KBT is clearly not entitled to judgment as a matter of law on Counts I, IV, VI, VIII, and IX of KeyCorp's Amended Complaint. Thus, KBT's motion for summary judgment with respect to these counts is denied.

### 3. KeyCorp's Motion for Summary Judgment as to KBT's Affirmative Defense of Abandonment of Registration No. 1,722,378

KeyCorp seeks summary judgment on KBT's affirmative defense contending that KeyCorp has abandoned the federally-registered service mark shown in Registration No. 1,722,378 (the L-shaped mark). In asserting the defense of abandonment, KBT contends that, with the adoption of the 1996 mark, KeyCorp intended to discontinue use of the L-shaped mark in favor of the 1996 design and mark. For the reasons discussed below, the court grants KeyCorp's Motion for Summary Judgment.

Actual use of a mark in commerce is what creates and builds up rights in a mark. *McCarthy on Trademarks, supra* at § 17.9. Accordingly, lack of actual use of a mark can cancel legal rights to such

mark. *Id.* Under 15 U.S.C. § 1127, a mark is deemed to be "abandoned ... [w]hen its use has been discontinued with intent not to resume such use." Thus, it is clear that a *prima facie* case of abandonment includes two elements: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir.1992) (citing *Silverman v. CBS Inc.*, 870 F.2d 40, 45 (2d Cir.1989)). Because abandonment results in a forfeiture of rights, these two elements must be proved by clear and convincing evidence. *McCarthy on Trademarks, supra* at § 17.12.

There is undisputed evidence in the record that KeyCorp has not discontinued all use of its L-shaped KEY BANK design and mark. Denise Benson, KeyCorp's Merchandising Manager, testified that KeyCorp bank branches in the Northeast and Northwest areas of the United States and in Alaska still use the mark. Key-Corp's Mot. for Sum. J. as to KBT's Affirmative Defense of Abandonment, Exh. 4, Benson Depo. at 24–25. In fact, KBT acknowledges that KeyCorp has not discontinued use of its L-shaped mark, hinging its argument instead on KeyCorp's intent to abandon the mark:

> The record is clear that KeyCorp has expressed a strong intent to abandon the L-shaped mark and to replace it with the new mark. The record is also clear that KeyCorp *is taking steps to do just that. The fact that it has not yet replaced all of the signage outside of its various branches* does not "trump" the testimony from its own witnesses.

KBT's Memo. Opp. KeyCorp's Mot. for Sum. J. as to KBT's Affirmative Defense of Abandonment of Registration No. 1,722,378 at 5 (emphasis added). *See The Kingsmen v. K–Tel Int'l Ltd.*, 557 F.Supp. 178 (S.D.N.Y.1983) (finding that a musical group had not abandoned its interest in the name "Kingsmen" even after ceasing to record and disbanding because the group continued to use the name to promote their previously recorded albums and because it continued to receive royalties for Kingsmen recordings).

Further, KBT's focus on KeyCorp's intent to abandon the mark at issue is misplaced. While intent to abandon was the touchstone of legal abandonment in early common law cases, the Lanham Act requires a showing of "intent not to resume," rather than "intent to abandon." *See Silverman v. CBS, Inc.*, 870 F.2d 40, 46 (2d Cir.1989). Logically, a showing of intent not to resume use of a mark follows a showing of discontinuation of use of a mark. Without being able to establish non-use of the L-shaped mark by Key-Corp, KBT certainly cannot establish that KeyCorp does not intend to resume use of the mark. This is true even if the company did at one time have the goal of discontinuing the L-shaped mark.

Because KBT has failed to show that KeyCorp has discontinued use of the L-shaped KEY BANK design *and* mark or that KeyCorp does not intend to resume use of the mark, elements essential to its affirmative defense of abandonment and on which it bears the burden of proof at trial, the court grants KeyCorp's Motion for Summary Judgment as to KBT's Affirmative Defense of Abandonment of Registration No. 1,722,378.

### 4. KeyCorp's Motion for Summary Judgment as to Counts II, IV, and VI of KBT's Counterclaims

KeyCorp moves for summary judgment on counts II, IV, and VI of KBT's counterclaims on the ground that KBT has abandoned use of the KEY ADVANTAGE mark. After careful consideration, the court finds that there is a genuine issue of material fact with respect to whether KBT has abandoned the KEY ADVANTAGE mark.

Again, abandonment occurs when a party (1) discontinues use of a mark and (2) does so with the intent not to resume using it. 15 U.S.C. § 1127. The fact that KBT

has stopped using the KEY ADVANTAGE mark is not in dispute. When KeyCorp initiated this action, KBT recalled all promotional brochures which used the KEY ADVANTAGE mark. However, KBT's intent to resume use of the "Key Advantage" mark is heavily disputed.

In support of its assertion that KBT has no intent to resume use of the KEY ADVANTAGE mark, KeyCorp relies on the fact that KBT destroyed the brochures which it recalled. Conversely, KBT has submitted an affidavit by David Wells, President of KBT, stating that KBT intends to reuse the KEY ADVANTAGE mark if the resolution of this matter is favorable to KBT.

The court finds that, viewing the evidence in a light most favorable to KBT, there are genuine issues of material fact with respect to whether KBT intends to use the KEY ADVANTAGE mark in the future. This is especially true in light of KeyCorp's heavy burden of proof, clear and convincing evidence, on this issue. Moreover, there would be little justification in penalizing an alleged infringer for proceeding cautiously and taking steps to lessen its damages should it be found liable. Therefore, KeyCorp's motion for summary judgment with respect to counts II, IV and VI of KBT's counterclaims is denied.

### III. KBT'S MOTION TO STRIKE PORTIONS OF THE DECLARATIONS OF ALISON POTTS AND PAMELA GODING

KBT moves to strike portions of the Declarations of Alison Potts and Pamela Goding, filed in support of KeyCorp's Motion for Summary Judgment as to Counts I, III, V and VI of KBT's Counterclaims, on the grounds that the declarations were not based on the personal knowledge of the declarants and that they contain inadmissible hearsay. Because the court has not considered either the Potts or the Goding declarations in ruling on either KeyCorp's Motion for Summary Judgment or on KBT's Motion for Partial Summary Judgment, KBT's motion is denied. Of course, this Order does not preclude KBT from objecting to the use of any possible trial testimony by Potts or Goding that does not conform to the Federal Rules of Evidence.

### IV. KBT'S MOTION TO STRIKE A PORTION OF KEYCORP'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II, IV AND VI OF KBT'S COUNTERCLAIMS

KBT claims that KeyCorp, in its reply memorandum in support of its motion for summary judgment as to counts II, IV and VI of KBT's counterclaims, misrepresented statements made by David Wells in his deposition testimony. It moves to strike that portion of KeyCorp's reply memorandum relating to Mr. Wells' testimony. Because the court has denied KeyCorp's motion for summary judgment on these counterclaims, it denies KBT's motion as moot.

### V. CONCLUSION

For the foregoing reasons, the court: (1) grants KeyCorp's Motion for Summary Judgment as to Counts I, III, V and VI of KBT's Counterclaims insofar as these counterclaims relate to KeyCorp's use of the mark KEY BANK, but denies it insofar as the counterclaims relate to KeyCorp's use of the mark KEY ADVANTAGE (Doc. No. 50); (2) denies KBT's Motion for Partial Summary Judgment (Doc. No. 55); (3) grants KeyCorp's Motion for Summary Judgment as to KBT's Affirmative Defense of Registration No. 1,722,378 (Doc. No. 52); (4) denies KeyCorp's Motion for Summary Judgment as to Counts II, IV and VI of KBT's Counterclaims (Doc. No. 53); (5) denies KBT's Motion to Strike Portions of the Declarations of Alison Potts and Pamela Goding (Doc. No. 91); and (6) denies KBT's Motion to Strike a Portion of KeyCorp's Re-

ply Memorandum in Support of KeyCorp's Motion for Summary Judgment (Doc. No. 100).

IT IS SO ORDERED.